[No. 28052.   *En Banc.*   December 2, 1940.]

ARMINTA V. ZINN, *Respondent,* v. EQUITABLE LIFE IN-
SURANCE COMPANY OF IOWA, *Appellant,* EARLE
WOODELLE ZINN, JR., *et al., Respondents.*[1]

*Kahin, Carmody & Schramm,* for appellant.

*Caldwell, Lycette & Diamond* and *Earle W. Zinn, Jr.,*
for respondents.

SIMPSON, J.—Plaintiff instituted actions for the pur-
pose of collecting amounts claimed to be due under the

[1]Reported in 107 P. (2d) 921.

double indemnity provision of four life insurance policies insuring Earle W. Zinn. Two actions were brought, one involving three policies of insurance and the other involving one policy. The cases were tried together, although separate judgments were entered in each. They have been consolidated for the purposes of appeal.

After action was begun, Earle W. Zinn, Jr., and Dorothy A. Zinn were made additional defendants, for the reason that they are contingent beneficiaries under each of the policies of insurance. The case was tried to the court sitting without a jury. At the conclusion of the trial, findings of fact were made, and judgment was entered in favor of plaintiff and the additional defendants. Thereafter, defendant Equitable Life Insurance Company of Iowa presented its motion for a new trial on the ground that there was no evidence or reasonable inference from the evidence to justify the judgment, and that error in law occurred at the trial, excepted to at the time by defendant. The motion for a new trial was denied. The life insurance company has presented this appeal.

Appellant's assignments of error are that the court erred in finding that the death of Earle W. Zinn resulted from external, violent, and accidental means; in making findings of fact and conclusions of law in favor of respondents; in entering judgment in favor of respondents; and in denying appellant's motion for a new trial.

The undisputed facts are as follows: Arminta V. Zinn is the widow of the insured, and Earle W. Zinn, Jr., and Dorothy A. Zinn are their children. Appellant issued four separate policies of insurance on the life of Earle W. Zinn.

Two of the policies provide that the company will pay double the face of the policy if death results

" . . . directly and independently of all other causes, from bodily injuries effected solely through external, violent and accidental means . . .; provided such death did not occur . . . as a result directly or indirectly of disease in any form. . . ."

The other two policies provide that double the face of the policy will be paid if death results

" . . . directly and independently of all other causes, from bodily injuries effected solely through external, violent and accidental means, contained in paragraphs 17 and 19 hereof."

Paragraph 17, mentioned in the above quotation, provided:

"Nor shall such benefit be payable in case such death resulted directly or indirectly from (a) bodily or mental infirmity or disease in any form. . . ."

For several years just prior to his death, Earle W. Zinn was a strong, healthy, and active business man. In October, 1937, he was examined by a doctor, who advised him that he had high blood pressure. After that date, Mr. Zinn continued to conduct his business affairs as usual and did not exhibit any evidences of ill health.

February 9, 1939, the insured visited his doctor's office. At that time, in order to relieve the high blood pressure condition, the doctor made a small incision in the insured's left arm near the elbow, and withdrew some blood therefrom. The lancing was intentional, and the usual precautionary measures to prevent infection were carried out. Three days thereafter, the arm presented a bruised appearance and was swollen to a considerable extent. On the morning of February 17th, Mr. Zinn was taken to a hospital, where he died that night.

An autopsy was performed by five well-qualified pathologists of the city of Seattle. They concluded

that the cause of the insured's death was staphylococcus septicemia, or what is commonly called blood poisoning, brought about by the introduction of a germ known as staphylococcus into the incision made by the physician in withdrawing blood from the arm. The pathologists testified that the germ entered the body of the insured from the outside at the time the incision was made, or subsequently at times when the wound was dressed. They testified that incisions such as the one made by insured's doctor are a very common procedure in hospitals in Seattle, that it was done hundreds of times each day, and that infections following the incisions were very unusual and only happened on rare occasions.

The question to be decided is whether death is accidental within the meaning of the provisions of insurance policies providing double indemnity for death resulting "directly and independently of all other causes, from bodily injuries effected solely through violent, external and accidental means," where an operation is performed and an incision intentionally made, the usual precautions to prevent infection are taken, no mishap occurs during the operation, germs enter from without through the incision and result in septicemia, the entry of the germs being entirely unforeseen, unusual, unexpected, and unintended.

The authorities reflect two clearly defined lines of thought upon this question. One line of cases holds that death is not accidental in cases in which an unusual or unexpected result occurs by reason of the doing of an intentional act on the part of the insured; that it must appear that the means used was accidental, and that it is not sufficient to show that the final result was unusual, unexpected, or unforeseen. The other line of cases holds that, where injury or death is the unusual, unexpected, or unforeseen result of an in-

tentional act, such injury or death is by accidental means, even though there is no proof of mishap, mischance, slip, or anything out of the ordinary in the act or event which causes the injury or death.

It is impractical to attempt a discussion of all the cases which might have some bearing on the solution of the question before us. Counsel cite over one hundred cases in their briefs which deal with the problem contained in the case at bar.

The following cases support the holding that death is not accidental where the means are intentional, but the results are unusual or unexpected: *Mitchell v. New York Life Ins. Co.,* 136 Ohio St. 551, 27 N. E. (2d) 243; *Caldwell v. Travelers' Ins. Co.,* 305 Mo. 619, 267 S. W. 907, 39 A. L. R. 56; *Kimball v. Massachusetts Acc. Co.,* 44 R. I. 264, 117 Atl. 228, 24 A. L. R. 726; *Smith v. Travelers Ins. Co.,* 219 Mass. 147, 106 N. E. 607, L. R. A. 1915B, 872; *Lehman v. Great Western Acc. Ass'n,* 155 Iowa 737, 133 N. W. 752, 42 L. R. A. (N. S.) 562; *Northam v. Metropolitan Life Ins. Co.,* 231 Ala. 105, 163 So. 635, 111 A. L. R. 622; *Curry v. Federal Life Ins. Co.,* 221 Mo. App. 626, 287 S. W. 1053; *Pope v. Business Men's Assurance Co.,* 131 S. W. (2d) (Mo. App.) 887.

Other cases, such as *Gohlke v. Hawkeye Commercial Men's Ass'n,* 198 Iowa 144, 197 N. W. 1004, 35 A. L. R. 1177; *Hruzek v. Old Line Life Ins. Co.,* 221 Wis. 279, 265 N. W. 566; *O'Connell v. New York Life Ins. Co.,* 220 Wis. 61, 264 N. W. 253; *Taylor v. New York Life Ins. Co.,* 176 Minn. 171, 222 N. W. 912, 60 A. L. R. 959; *Whatcott v. Continental Casualty Co.,* 85 Utah 406, 39 P. (2d) 733; *Carter v. Standard Acc. Ins. Co.,* 65 Utah 465, 238 Pac. 259, 41 A. L. R. 1495; *Equitable Life Assurance Society v. Hemenover,* 100 Colo. 231, 67 P. (2d) 80, 110 A. L. R. 1270; *Horton v. Travelers' Ins. Co.,* 45 Cal. App. 462, 187 Pac. 1070; *Maryland Casualty Co.*

*v. Hazen,* 182 Okla. 623, 79 P. (2d) 577; *Spence v. Equitable Life Assurance Society,* 146 Kan. 216, 69 P. (2d) 713; *Goethe v. New York Life Ins. Co.,* 183 S. C. 199, 190 S. E. 451; *King v. Commercial Casualty Ins. Co.,* 197 N. C. 566, 150 S. E. 19; *Newsoms v. Commercial Casualty Ins. Co.,* 147 Va. 471, 137 S. E. 456, 52 A. L. R. 363; *Ocean Acc. & Guarantee Corp. v. Glover,* 165 Va. 283, 182 S. E. 221; *Brown v. Continental Casualty Co.,* 161 La. 229, 108 So. 464, 45 A. L. R. 1521; *Garrett v. International Travelers' Ass'n,* 14 S. W. (2d) (Tex. Civ. App.) 944; *International Travelers' Ass'n v. Francis,* 119 Tex. 1, 23 S. W. (2d) 282; and *Washington Fidelity Nat. Ins. Co. v. Anderson,* 187 Ark. 974, 63 S. W. (2d) 535, uphold the idea that death is accidental, even though the means are intentional, where the results are unusual, unexpected, or unforeseen.

We feel that the principle of law announced in the cases last cited reflects the great weight of authority and rests upon sound legal principles.

■ In arriving at our conclusion, we start first with the rule of construction which prevails in the law of insurance to the effect that any ambiguities in the language of policies are to be interpreted in the light most favorable to the insured. *Ringstad v. Metropolitan Life Ins. Co.,* 182 Wash. 550, 47 P. (2d) 1045, 106 A. L. R. 1532; *Miller v. Penn Mut. Life Ins. Co.,* 189 Wash. 269, 64 P. (2d) 1050; *Sills v. Sorenson,* 192 Wash. 318, 73 P. (2d) 798; *Kane v. Order of United Commercial Travelers,* 3 Wn. (2d) 355, 100 P. (2d) 1036.

■ Another rule of construction in the law of insurance which is generally followed is that the language of insurance policies is to be interpreted in accordance with the way it would be understood by the average man, rather than in a technical sense. *Kane v. Order of United Commercial Travelers, supra;*

*Lewis v. Ocean Acc. & Guarantee Corp.*, 224 N. Y. 18, 120 N. E. 56, 7 A. L. R. 1129.

It will be readily seen that both of the rules mentioned spring from the same basic concept, namely, that the one who is responsible for the preparation of a contract should be the one to suffer from any ambiguities appearing therein.

Keeping those principles of construction in mind, we are confronted with the proper interpretation to be given to the words "bodily injuries effected solely through violent, external, and accidental means." "Accidental" is defined in 1 C. J. S. 448 as follows:

"It has been said that, like 'accident' (ante), the adjective 'accidental' may not have a technical meaning, and generally is to be considered and construed according to common speech and usage, or in its ordinary, popular sense. When applied to injuries, the word, it has been said, generally implies that the injury must partake of the unusual, casual or fortuitous."

In *Horsfall v. Pacific Mut. Life Ins. Co.*, 32 Wash. 132, 72 Pac. 1028, 98 Am. St. 846, 63 L. R. A. 425, we stated:

"The policy insured the deceased against the effect of bodily injuries 'caused solely by external, violent, and accidental means.' Death by accident is defined to be ' "death from any unexpected event, which happens as by chance, or which does not take place according to the usual course of things." ' "

Again, in *McNally v. Maryland Casualty Co.*, 162 Wash. 321, 298 Pac. 721, we quoted with approval the following passage from *Zurich General Acc. & Liability Ins. Co. v. Flickinger*, 33 F. (2d) 853, 68 A. L. R. 161:

" ' "An effect which is the natural and probable consequence of an act or course of action is not an accident, nor is it produced by accidental means. It is either the result of actual design, or it falls under the maxim that every man must be held to intend the natural and probable consequence of his deeds. On

the other hand, an effect which is not the natural or probable consequence of the means which produced it, an effect which does not ordinarily follow and cannot be reasonably anticipated from the use of those means, an effect which the actor did not intend to produce and which he cannot be charged with the design of producing, . . . is produced by accidental means. It is produced by means which were neither designed nor calculated to cause it. Such an effect is not the result of design, cannot be reasonably anticipated, is unexpected, and is produced by an unusual combination of fortuitous circumstances; in other words, it is produced by accidental means." ' "

Justice Cardozo, in *Lewis v. Ocean Acc. & Guarantee Corp.*, *supra*, which involved a death resulting from puncturing a pimple, stated:

"Unexpected consequences have resulted from an act which seemed trivial and innocent in the doing. Of itself, the scratch or the puncture was harmless. Unexpectedly it drove destructive germs beneath the skin, and thereby became lethal. To the scientist who traces the origin of disease, there may seem to be no accident in all this. 'Probably it is true to say that in the strictest sense and dealing with the region of physical nature, there is no such thing as an accident.' (Halsbury, L. C., in *Brintons v. Turvey*, L. R. 1905 A. C. 230, 233). But our point of view in fixing the meaning of this contract, must not be that of the scientist. It must be that of the average man (*Brintons v. Turvey*, *supra; Ismay Imrie & Co. v. Williamson*, L. R. 1908 A. C. 437, 440). Such a man would say that the dire result, so tragically out of proportion to its trivial cause, was something unforeseen, unexpected, extraordinary, an unlooked-for mishap, and so an accident. This test—the one that is applied in the common speech of men—is also the test to be applied by courts."

The case of *Carpenter v. Pacific Mut. Life Ins. Co.*, 145 Wash. 679, 261 Pac. 792, lays down a principle of law which to a large extent determines the disposition

of the case before us. In that case, the facts were stated to be as follows:

"The insured discovered, while about his daily tasks on the farm, that one of his sheep had died, and proceeded to skin it. At the time, his hands were somewhat abraded, as is not unusual with men engaged in rough work. After he had completed the skinning, he washed his hands and applied carbolic salve as a disinfectant, as was his usual custom. The following day he complained of pain in his arm, and upon its increasing, he consulted a physician the next day. Later that day he took to his bed, was removed to the hospital on the following day, and, although he was given what appears to have been proper and skillful treatment, he died within five days from the time of the skinning of the carcass of the sheep."

The doctor testified that, in his opinion, the condition of the insured's hand and the act of skinning the sheep were the sole causes of the infection which caused the death. He also testified that only a small percentage of abrasions, no matter what is done, results in infection. After discussing the question of whether or not the abrasions were accidentally sustained, we stated:

"Nor are we satisfied that, laying aside the previous abrasions, the infection itself was not an accident within the meaning of the policy. From the evidence we have already quoted, it will be seen that one might do just as the deceased did innumerable times with no ill results; but, on some rare occasion, with no known difference in conditions, infection would result. The germ enters from the outside; therefore, it is external. It is a foreign substance forced into the circulatory system; therefore, it enters by violence. Its entry was not intended or expected; therefore, it was accidental.

"The following authorities tend strongly to support this view.

" 'It is further urged that there was no evidence to support the verdict because no accident was shown.

We do not concur in this view. The two companions of the deceased jumped from the same platform, at the same time and place, and alighted safely. It must be presumed not only that the deceased intended to alight safely, but thought that he would. The jury were, on all the evidence, at liberty to say that it was an accident that he did not. The court properly instructed them that the jumping off the platform was the means by which the injury, if any was sustained, was caused; that the question was, whether there was anything accidental, unforeseen, involuntary, unexpected, in the act of jumping, from the time the deceased left the platform until he alighted on the ground; that the term "accidental" was used in the policy in its ordinary, popular sense, as meaning "happening by chance; unexpectedly taking place; not according to the usual course of things; or not as expected;" that, if a result is such as follows from ordinary means, voluntarily employed, in a not unusual or unexpected way, it cannot be called a result effected by accidental means; but that if, in the act which precedes the injury, something unforeseen, unexpected, unusual occurs which produces the injury, then the injury has resulted through accidental means.' *United States Mutual Accident Association v. Barry,* 131 U. S. 100, 38 L. Ed. 60.

"See, also, *James v. State Life Ins. Co.,* 83 Ind. App. 344, 147 N. E. 533; *Bryant v. Continental Casualty Co.,* 107 Texas 582, 182 S. W. 673, Ann. Cas. 1918A 517; *Lewis v. Ocean Accident & Guarantee Corp. of London,* 224 N. Y. 18, 120 N. E. 56; *Christ v. Pacific Mutual Life Ins. Co.,* 312 Ill. 525, 144 N. E. 161; *Brown v. Continental Casualty Co.,* 161 La. 229, 108 South. 464; *Carter v. Standard Accident Ins. Co.,* 65 Utah 465, 238 Pac. 259; *Hornby v. State Life Ins. Co.,* 106 Neb. 575, 184 N. W. 84; *Rowe v. United Commercial Travelers' Association,* 186 Iowa 454, 172 N. W. 454; *Interstate Business Men's Accident Ass'n v. Lewis,* 257 Fed. 241.

"Several of these cases have a surprising similarity as to the facts, and, when carefully read, each and all support a holding that the infection was of itself an accident within the terms of the policy."

The policy involved in *McNally v. Maryland Casualty Co.*, 162 Wash. 321, 298 Pac. 721, provided for indemnity against loss resulting from bodily injuries " 'effected independently and exclusively of all other causes directly through accidental means.' " In that case, it appears that the insured intended to drink Scotch whiskey, but, by mistake and without his intent, drank wood alcohol. This court held that the injury caused by the drinking of wood alcohol was an accident and cited with approval *Zurich General Acc. & Liability Ins. Co. v. Flickinger*, 33 F. (2d) 853, 68 A. L. R. 161, as follows:

" 'On the first and principal contention of defendant, we think there can be no question that the death of insured resulted from accidental means within the meaning of the policy. Insured intended, it is true, to drink the cocktails which he did drink and which caused his death, but he did not intend to drink poisonous wood alcohol, and did not know that wood alcohol was contained in what he was drinking. The case falls squarely, therefore, within the oft-quoted rule laid down by Mr. Justice Blatchford in the leading case of *U. S. Mutual Accident Ass'n v. Barry*, 131 U. S. 100, 9 S. Ct. 755, 759, 33 L. Ed. 60: "If in the act which precedes the injury something unforeseen, unexpected, unusual, occurs, which produces the injury, then the injury has resulted through accidental means." Here the act which preceded the injury was the drinking of the supposed intoxicating beverage. And the thing which was "unforeseen, unexpected or unusual" therein was the fact that it contained wood alcohol, a deadly poison. In other words, there was the unintentional and unexpected drinking by insured of a poisonous substance.' "

A case in point is that of *Jensma v. Sun Life Assurance Co.*, 64 F. (2d) 457. The policy in that case covered injuries resulting " 'through external, violent and accidental means.' " The facts showed that a doctor administered to the insured a hay fever treatment

by injecting into the body of the insured some pollen extract. From some source, spores of an anaerobic gas-producing organism got into the incision made by the injecting needle, from which the insured died. The court found as a matter of fact that neither the pollen extract nor the needle in the syringe was the source of the infection. It did find that the source of the infection was either the surface of the insured's arm or some unknown substance which, after completion of the operation, came in contact with the abrasion left by it or came in contact with the wound left by the scratching of the small scab covering the abrasion. It was shown that, after the injection, a red spot appeared on the insured's arm, and later the redness increased to about the size of a dollar and there was some swelling. On the third day after the injection, the insured was taken to the hospital, where he died the next day. Speaking of the evidence introduced, the court stated:

"In our opinion, it establishes a complete and unbroken chain of causation between the injection and the death of the insured—a result that was quite unforeseen at the time the simple hypodermic treatment was administered to him. It is true that we are unable to say at what instant of time the gas-producing organisms fastened themselves upon the victim's tissues; but there can be no doubt that they entered over the trail blazed by the hypodermic needle. Such entry caused blood poisoning; blood poisoning caused the death. 'The cause of the cause is the cause of the effect.'

"Search as we may, we can find no suggestion of any efficient or proximate cause or means of the death other than the injection and the resulting infection. In the present advanced state of medical science, such a tragic result from a simple hay-fever injection is 'unforeseen, unexpected, unusual.' As we have already intimated, we need not know at what precise instant of time, by what precise instrumentality, or

through what precise avenue the deadly organisms entered the insured's body; for it is in the very nature of an accident that its exact causes should not be susceptible of mathematical demonstration.

"All the substantial evidence requires the conclusion that death was the result of violent, external, and accidental means, and there is no substantial evidence to the contrary, and therefore, the jury having been waived, judgment should have been entered for the appellant."

The holding in *Connelly v. Hunt Furniture Co.*, 240 N. Y. 83, 147 N. E. 366, 39 A. L. R. 867, has an important bearing upon the question before us. In that case, an undertaker's assistant had handled a gangrenous corpse. He later scratched a pimple with a germ-infested finger, causing infection to set in, resulting in his death. In determining whether or not the death was accidental, the court stated:

"We have little doubt that common understanding would envisage this mishap as an accident, and that common speech would so describe it. Germs may indeed be inhaled through the nose or mouth, or absorbed into the system through normal channels of entry. In such cases their inroads will seldom, if ever, be assignable to a determinate or single act, identified in space or time (*Matter of Jeffreyes v. Sager Co.*, 198 App. Div. 446; 233 N. Y. 535). For this as well as for the reason that the absorption is incidental to a bodily process both natural and normal, their action presents itself to the mind as a disease and not an accident. Our mental attitude is different when the channel of infection is abnormal or traumatic, a lesion or a cut. If these become dangerous or deadly by contact with infected matter, we think and speak of what has happened as something catastrophic or extraordinary, a mishap or an accident (cf. *Lewis v. Ocean A. & G. Corp., supra,* [224 N. Y. 18] at p. 21), though very likely a disease also. 'A common sense appraisement of everyday forms of speech and modes of thought

must tell us when to stop' (*Bird v. St. Paul F. & M. Ins. Co.*, 224 N. Y. 47, 51)."

After a consideration of the authorities cited, including our own cases, we hold that death is accidental, within the meaning of the provisions of insurance policies such as we have in the case at bar, where death occurs as the result of unusual, unexpected, or unforeseen events following an intentional act, provided that those events are not normally effected.

The incision made by the insured's physician was not uncommon. Incisions or punctures of the skin or blood vessels are made, according to the testimony of pathologists, thousands of times each month in hospitals in Seattle without any serious results. Infection follows only on rare occasions. So, in this case, although the incision which afforded a channel of entry for the germs was intentionally made, the entry of the deadly germs was not normally effected, but was wholly unintentional, unforeseen, and unexpected, and it was the admission of those germs, rather than the intentional act of the doctor, which caused the death. The infection itself was as much an accident as though the insured had been struck by an automobile and killed on his way to the hospital. The germs came from the outside into the incision, and their actions were more deadly and vicious than many visible instruments of violence.

We hold that the death of Mr. Zinn was accidental, and that the appellant is liable upon its policy which insured against injury by accident.

The judgment is affirmed.

ALL CONCUR.