[No. 19972–2–I.  Division One.  April 11, 1988.]

WESTMAN INDUSTRIAL COMPANY, *Appellant,* v. HARTFORD INSURANCE GROUP, *Respondent.*

*Wesley K. Duce, Duce & Gehret,* and *Richard A. Nelle,* for appellant.

*John P. Erlick* and *Cozen & O'Connor,* for respondent.

COLEMAN, A.C.J.—Westman Industrial Company appeals the trial court order granting summary judgment in favor of Hartford Insurance Group. Westman had sought indemnification and reimbursement of defense costs from Hartford for a judgment entered against Westman arising out of the

storm destruction of a boathouse built by Westman and the resulting damages to surrounding property. We affirm.

The trial court, when analyzing the motion for summary judgment in this case, reviewed the findings of fact and conclusions of law in the underlying case that established Westman's liability arising from the destruction of the boathouse. Those findings, in part, establish:

> At all times material hereto Blaine Marine Projects has been a joint venture entered into between Birch Bay Development and Ken Cannon. At all times material hereto, Birch Bay Development and Ken Cannon were the general partners of Blaine Marine Projects.
>
> In 1978–1979, Blaine Marine Projects developed a boathouse project known as "Blaine Covered Moorage II," which consisted of a 22 slip boathouse located in Blaine Harbor, Blaine, Whatcom County, Washington. Blaine Marine Projects caused the boathouse to be built and sold off slips to various boat owners.
>
> C. Contractor
>
> At all times material hereto, third party defendant Westman Industrial Company has been a corporation organized and existing under Washington law. Westman Industrial Company has paid all taxes due the state of Washington and otherwise complied with all conditions precedent to defending this suit.
>
> Westman Industrial Company built the boathouse in question, Blaine Covered Moorage II.
>
> . . .

## II.
### Facts Surrounding Building of Boathouse

In 1979, Blaine Marine Projects contracted with Westman Industrial Company to build the Blaine Covered Moorage II boathouse. At the time the contract was entered into, neither party contemplated that the boathouse had to be built in accordance with the Uniform Building Code.

Westman Industrial Company's president, Carl Westman, had had experience in building boathouses; however, his outfit, Westman Industrial Company, had not had any experience as of 1979 in erecting buildings. Some of the individuals associated with Blaine Marine Projects had had experience as of 1979 in hiring architects and in planning projects so as to conform to the requirements of

building codes, such that Blaine Marine Projects was more experienced along these lines than the average consumer.

Although the written contract entered into between the parties did not specify who had the responsibility for obtaining building permits, Westman Industrial Company assumed that responsibility by applying for, and taking out, a building permit for Blaine Covered Moorage II with the city of Blaine. The primary duty of complying with the Uniform Building Code, and with the conditions of the permit itself, fell upon the contractor, Westman Industrial Company.

The boathouse which Westman built for Blaine Marine Projects was inadequately designed and failed to conform with the requirements of the Uniform Building Code. As a result, the boathouse was structurally unstable and lacked adequate resistance to wind uplift.

Both Blaine Marine Projects and Westman Industrial Company were negligent in arranging for the building of, and in building, Blaine Covered Moorage II without insuring that the boathouse conformed to applicable building codes. Sixty percent of the fault lies with Westman industrial company and forty percent of the fault lies with Blaine Marine Projects.

III.

Facts Surrounding Accident and Damages

On November 15, 1981, the Blaine Covered Moorage II boathouse was totally destroyed in a storm. The boathouse became airborne, broke apart and in the process caused damage to certain boats moored downwind of the boathouse, including the Hull and May boats.

The accident was proximately caused by the structural instability of the building and particularly by its lack of adequate resistance to wind uplift. These deficiencies in turn directly resulted from the fact that the building was not erected in accordance with the provisions of the Uniform Building Code.

As a proximate result of the accident, the Hull boat (the "Three J's") was totally destroyed. The fair market value of the boat prior to the storm was $14,000 and it has salvage value of $2,500, leaving net damages to the Hulls in the amount of $11,500.

As a proximate result of the accident, the May boat

(the "Sundowner") sustained damages. The reasonable cost of repairing the damages to the Sundowner sustained in the storm is $3,508.76.

As a proximate result of the accident, the boathouse itself was totally destroyed. The reasonable replacement cost of the boathouse, including the cost of cleaning up debris from the harbor, but excluding redesign costs, is $237,162.

In the underlying trial, Westman and Blaine, et al, were found jointly and severally liable. The plaintiffs in that action were awarded a judgment against Westman for damage to the boathouse in the amount of $237,162 and $15,008.76 for damage to nearby boats struck by pieces of the flying boathouse. Westman was to be indemnified by Blaine, et al, for any amount it paid in excess of 60 percent of the judgment.

Westman sought indemnification for this judgment and for the costs of defending the action from Hartford, the insurer on Westman's comprehensive general liability policy. Hartford successfully argued in the summary judgment motion that damages to the boathouse were not covered because an endorsement in the policy excluded coverage for damage to, or arising from, Westman's own products or work. Hartford also prevailed on its argument that an endorsement excluded coverage for damage to third parties caused by Westman's boathouse.

The relevant comprehensive general liability policy was issued to Westman effective November 24, 1980 to November 24, 1981. That policy provides that:

> The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of
>
> . . .
>
> Coverage B—property damage to which this insurance applies, caused by an occurrence, and the company shall have the right and duty to defend any suit against the insured seeking damages on account of such bodily injury or property damage, . . .

■ Respondent's motion for summary judgment hinged on the interpretation of the exclusionary clauses in Westman's policy.

> There are certain basic principles that apply in any examination of exclusionary clauses in insurance contracts. Chief among these is that exclusionary clauses are to be most strictly construed against the insurer. *West Am. Ins. Co. v. State Farm Mut. Auto. Ins. Co.*, 4 Wn. App. 221, 480 P.2d 537 (1971); *Murray v. Western Pac. Ins. Co.*, 2 Wn. App. 985, 472 P.2d 611 (1970). The policy should be interpreted in accordance with the way it would be understood by the average person purchasing insurance. *Zinn v. Equitable Life Ins. Co.*, 6 Wn.2d 379, 107 P.2d 921 (1940).

*Phil Schroeder, Inc. v. Royal Globe Ins. Co.*, 99 Wn.2d 65, 68, 659 P.2d 509 (1983).

When reviewing a summary judgment the appellate court engages in the same inquiry as the trial court. *Hostetler v. Ward*, 41 Wn. App. 343, 346, 704 P.2d 1193 (1985), *review denied*, 106 Wn.2d 1004 (1986). Summary judgment is proper only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." CR 56(c). The court must consider all facts submitted and all reasonable inferences from the facts in the light most favorable to the nonmoving party. *Wilson v. Steinbach*, 98 Wn.2d 434, 437, 656 P.2d 1030 (1982).

Hartford was obligated under the general liability policy to pay all property damages Westman was liable for as a result of an "occurrence." The policy defines an occurrence as "an accident, including continuous or repeated exposure to conditions, which results in *bodily injury* or *property damage* neither expected nor intended from the standpoint of the *insured*." The determination of "occurrence" is made "by reference to when the injury giving rise to the claim occurred." *Castle & Cooke, Inc. v. Great Am. Ins. Co.*, 42

Wn. App. 508, 517, 711 P.2d 1108, *review denied,* 105 Wn.2d 1021 (1986).

Respondent contends the occurrence in this case was the storm destruction of the Blaine Covered Moorage II on November 15, 1981, and the resulting damage to third party boat owners. Appellant claims that the occurrence was the failure of building inspectors to notice the inadequacy of the building. While the boathouse's defective design may have been the root cause of its eventual destruction, the actual "injury giving rise to the claim" was its destruction in the wind storm. *Castle & Cooke,* at 517. Thus, the occurrence in this case was the destruction of the boathouse.

Hartford denied coverage because its general liability policy excluded property damages to the insured's "products."

> This insurance does not apply:
>
> . . .
>
> (n) to property damage to the named insured's products arising out of such products or any part of such products;[1]

There being no question that the boathouse's destruction was property damage, the applicability of exclusion (n) depends entirely on whether the boathouse was Westman's product. We are persuaded that, for purposes of this policy, it was a product.

Appellant argues that the damages both to and caused by the boathouse were not excluded from the policy because it was not a product and because the products exclusion does not apply where the insured's business primarily involves the provision of services. For the proposition that the boathouse was not a product, appellant relies on *Charlton v.*

---

[1]The policy defines "property damage" as: "(1) physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom, or (2) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an occurrence during the policy period . . .".

*Day Island Marina, Inc.,* 46 Wn. App. 784, 732 P.2d 1008 (1987), in which the court noted:

> We doubt that a boathouse qualifies as a "product" under [Restatement (Second) of Torts § 402A (1965) (strict liability)], given its similarities to other buildings. . . . We also doubt that the boathouse would be defective—unreasonably dangerous—as that term is defined for strict liability purposes, in light of our determination that [the injured party] was misusing it on the night in question. However, because plaintiffs have failed to provide us with argument or pertinent authority for the proposition that the boathouse was indeed a product, "[w]e decline to enter this thicket". *Yeats v. Estate of Yeats,* 90 Wn.2d 201, 209, 580 P.2d 617 (1978).

(Footnote and citation omitted.) *Charlton,* at 791. We find this language inapposite to the issue at hand. Whether an item built by a manufacturer should be considered a product for purposes of strict liability is a very different question from whether an item built by an insured should be considered a product for purposes of a product exclusion in a general liability policy. The considerations are not comparable.

The strict liability inquiry involves questions such as the public interest in safety, whether the manufacturer's solicitation of customers causes them to rely on the product's safety, whether it is just to place the loss on a manufacturer who creates the risk and reaps the benefit of placing it in commerce, and, finally, whether the seller can fairly spread the loss to the public as a cost of doing business. *Bastian v. Wausau Homes, Inc.,* 620 F. Supp. 947, 949–50 (N.D. Ill. 1985); *see also Controlled Atmosphere, Inc. v. Branom Instrument Co.,* 50 Wn. App. 343, 351, 748 P.2d 686 (1988). The insurance exclusion inquiry is more narrow, principally involving questions of contract construction. In *Prosser Comm'n Co. v. Guaranty Nat'l Ins. Co.,* 41 Wn. App. 425, 431, 700 P.2d 1188 (1985), the court noted that *product,* for purposes of a product exclusion to a general liability policy, means "goods which are processed or assembled in the ordinary channels of commerce." *Prosser,* at 431.

While appellant was not in the ordinary business of building boathouses, the transaction was an ordinary arms–length business deal between a buyer and a seller. The boathouse was manufactured in part at appellant's business, then taken to the Blaine Marina where the parts were assembled. As such, the boathouse was "assembled in the ordinary channels of commerce." *Prosser*, at 431.

■ Appellant also points out a line of cases, of which *Rowland Constr. Co. v. St. Paul Fire & Marine Ins. Co.*, 72 Wn.2d 682, 688, 434 P.2d 725 (1967) is the seminal opinion, that hold a house is not a product for purposes of the products exclusion to general liability policies. Unfortunately for appellant, however, differences in the products exclusionary language between that involved in the *Rowland* case and that in appellant's policy render the holding in *Rowland* inapplicable here.

In *Rowland*, the exclusionary language provided:

This policy does not apply:

. . . .

(h) . . . to injury or destruction of:

. . . .

(4) any goods, products, or containers thereof manufactured, sold, handled or distributed by the Insured, or work completed by or for the Insured, *out of which the accident arises*, nor to costs of repair or replacement thereof. (Italics ours.)

*Rowland*, at 686. The insured contractor built and sold a home that was damaged by a faulty firebox. The court held that the exclusionary language

does not apply to the entire house as being the "product" of respondent, but only to the component parts thereof out of which the accident arose. As to such component parts only, [the] exclusion . . . operates to prevent the insured in this action from recovering the costs of replacement and repair.

*Rowland*, at 688. In reaction to this case and its progeny, insurance companies around the nation revised the standard products exclusionary language to ensure that coverage was excluded for property damage to the insured's

entire product, not just the component out of which the damages arose. *Indiana Ins. Co. v. DeZutti*, 408 N.E.2d 1275, 1281 (Ind. 1980). As a result of this language change, the standard products exclusion is now universally construed to include houses in the definition of *product. See, e.g., DeZutti*, 408 N.E.2d at 1280; *Haugan v. Home Indem. Co.*, 86 S.D. 406, 197 N.W.2d 18, 22 (1972). *See also Weedo v. Stone–E–Brick, Inc.*, 81 N.J. 233, 405 A.2d 788, 792 (1979) (standard products exclusion includes damages to faulty stucco siding insured installed on customer's home).

We find the reasoning in these cases persuasive and see no reason for distinguishing between a house and a boathouse. Courts adopting this position hold that the plain, unambiguous language of the typical products exclusion includes houses as products. *DeZutti*, 408 N.E.2d at 1280 (contractor's "product or work must be the entire project or house which he built and sold"); *Eulich v. Home Indem. Co.*, 503 S.W.2d 846, 849 (Tex. Civ. App. 1973) ("property damage to work performed" includes damage to building constructed by insured contractor). Moreover, we concur with the rationale expressed in these cases as to the purpose of the products exclusion. A general liability policy is not intended to encompass the risk of an insured's failure to adequately perform work, *i.e.*, a general liability policy is not a form of performance bond, product liability insurance, or malpractice insurance. *DeZutti*, at 1279 ("costs attendant upon the repair or replacement of the insured's own faulty work is part of every business venture and is a business expense to be borne by the insured–contractor in order to satisfy customers. It is a business risk long excluded by comprehensive liability policies."); *Weedo*, 405 A.2d at 791–92; *Eulich*, at 849 (general liability policy "does not insure the contractor against his own failure to perform his contract . . .") *Harrison Plumbing & Heating, Inc. v. New Hampshire Ins. Group*, 37 Wn. App. 621, 628, 681

P.2d 875 (1984) (comprehensive liability policy is not a performance bond on plumber's work). If an insured wants to procure coverage for damage to completed work, other applicable insurance coverages are available.[2]

■ Finally, appellant argues that even if the boathouse is a product, the products exclusion does not apply when the insured's business primarily involves furnishing services. Appellant relies heavily on the *Prosser* case in making this argument. *Prosser* held that the products exclusion did not apply to an insured in that case, whose business performed the service of cattle brokering and who negligently sold a diseased cow that infected the buyer's herd. *Prosser,* at 427. The *Prosser* court noted that "the products hazard exclusion does not apply where the insured's business primarily involves a service." *Prosser,* at 431. An examination of the cases the *Prosser* court relied on for that proposition and the factual context of the *Prosser* case itself convinces us, however, that the court was merely saying a products exclusion does not apply to damages arising from a business's provision of services. *See Prosser,* at 431 and cases cited therein. *See also Kammeyer v. Concordia Tel. Co.,* 446 S.W.2d 486, 489 (Mo. Ct. App. 1969); 12 G. Couch, *Insurance* § 44A:60, at 96 (2d ed. 1981) (products exclusion does not exclude liability for services performed). Thus, we are convinced that a products exclusion applies to damages to an insured's product regardless of whether the insured's business also involves the provision of services.

We next address whether the general liability policy covers damages to third party property owners whose boats were damaged by pieces of the flying boathouse. We hold that it does not.

---

[2]Appellant admits his business regularly involved the manufacture of a product—cannery tables. Indeed, appellant admitted in oral argument that he specifically declined to include a products coverage in this general liability policy because the risk involved from those tables is minimal.

The damage to the third party boats was of the type generally covered by the standard products hazard and completed operations hazard provisions in a typical general liability policy. *See Harrison,* at 628; *Weedo,* 405 A.2d at 791 (quoting Henderson, *Insurance Protection for Products Liability and Completed Operations—What Every Lawyer Should Know,* 50 Neb. L. Rev. 415, 441 (1971)).

The Hartford policy expressly indicated such coverages were available.

"[P]roducts hazard" includes bodily injury and property damage arising out of the named insured's products or reliance upon a representation or warranty made at any time with respect thereto, but only if the bodily injury or property damage occurs away from premises owned by or rented to the named insured and after physical possession of such products has been relinquished to others;

"[C]ompleted operations hazard" includes bodily injury and property damage arising out of operations or reliance upon a representation or warranty made at any time with respect thereto, but only if the bodily injury or property damage occurs after such operations have been completed or abandoned and occurs away from premises owned by or rented to the named insured. "Operations" include materials, parts or equipment furnished in connection therewith. . . .

However, by way of endorsement, such coverage was excluded from the Hartford policy:

This endorsement modifies such insurance as is afforded by the provisions of the policy relating to the following:

COMPREHENSIVE GENERAL LIABILITY INSURANCE

It is agreed that such insurance as is afforded by the Bodily Injury Liability Coverage and the Property Damage Liability Coverage does not apply to bodily injury or property damage included within the Completed Operations Hazard or the Products Hazard.

Consequently, appellant cannot now seek coverage for a

risk he specifically declined to purchase. The judgment of the trial court is, therefore, affirmed.

WILLIAMS and PEKELIS, JJ., concur.

Review denied by Supreme Court July 5, 1988.