6 P.3d 1 (2000)
100 Wash.App. 631
Kenneth GOODWIN, Appellant,
v.
George W. WRIGHT, Sara C. Wright, his wife, the marital community comprised thereof, and Eastside Machine & Hydraulic Company, a Washington corporation, Defendants, and
Western National Assurance Company, Respondent.
No. 43749-6-I.
Court of Appeals of Washington, Division 1.
March 27, 2000.
Publication Ordered April 17, 2000.
*3 Thomas G. Richards, Peizer, Richards & Ziontz, P.S., Seattle, for Appellant.
Don M. Gulliford, Don M. Gulliford & Associates, Leonard D. Flanagan, Bellevue, for Respondent.
William R. Hickman, Reed McClure, Seattle, for Other Parties.
*2 ELLINGTON, J.
Kenneth Goodwin was injured when a rebuilt hydraulic cylinder failed. Eastside Machine had made the cylinder by disassembling two others and making one. Eastside was insured by Western National Assurance Company under a commercial general liability policy. The only question on appeal is whether Western National properly denied coverage for Goodwin's injuries based on the "productscompleted operations hazard" exclusion in Eastside's policy. We hold the productscompleted operations hazard exclusion is unambiguous and bars coverage for Goodwin's injuries. We therefore affirm.

Facts
In September 1990, while working for Fruhling, Inc., Kenneth Goodwin was injured while operating an "end dump trailer," a dump truck designed to haul and dump heavy dirt loads. The trailer bed is raised and lowered by a hydraulic cylinder ram.
On the day of the accident, a newly-installed hydraulic cylinder ram failed on the way upwhile the truck was fully loaded with wet sand weighing approximately 25 tons. From inside the cab of the truck, Goodwin was operating the levers to raise the bed of the truck. When the bed reached about a 45-degree angle, the hydraulic ram exploded, sending parts of metal and hydraulic oil onto the cab. The unsupported truck bed dropped suddenly, driving the truck into the ground. Goodwin sustained injuries when he was bounced up and down inside the cab.
The cylinder that failed came from the insured, Eastside Machine. Fruhling had sent two non-functioning hydraulic cylinders to Eastside with a request to "disassemble two cylinders and make one out of the two." This process involves taking the cylinders apart, cleaning them, taking out gouges, scratches and other defects, and putting on new seals, guides, and sometimes new piston rings. Eastside's owner, George Wright, described this process as "we remanufactured one rebuilt dump truck cylinder for Fruhling."
When Eastside's owner delivered the cylinder to Fruhling, he offered a five percent discount for payment on delivery. Fruhling paid Eastside that day.
At the time of the accident, Eastside was insured under a commercial general liability (CGL) policy issued by Western National. Eastside paid a $1,215 annual premium for this coverage. The CGL policy excludes coverage for liability arising from products completed operations hazards. Eastside's owner deliberately did not purchase coverage for productscompleted operations hazards, which was available separately for an estimated $12,000 annually.
Goodwin filed a negligence suit against Eastside and its owners.[1] An order of default was entered against Eastside, and a default judgment was later entered in favor of Goodwin in the requested amount of $261,924.01. In March 1997, Goodwin served Western National with a writ of garnishment based on the default judgment.
Both parties moved for summary judgment. The trial court granted Western *4 National's cross motion because it was "convinced the work was completed," and therefore not covered. The trial court awarded Western National its costs and attorney fees under the garnishment statute.

Discussion
When reviewing a summary judgment, we engage in the same inquiry as the trial court.[2] The interpretation of an insurance policy is an issue of law we review de novo.[3] Policy language is interpreted as an average person would understand it, in a way that gives effect to each provision.[4] Where the language in an insurance policy is clear, we will enforce it as written and will not modify the contract or create ambiguity where none exists.[5] But where an insurance policy provision is fairly susceptible to two different reasonable interpretations, it is ambiguous.[6] An ambiguity in an exclusionary clause is construed against the insurer.[7]
The Policy
The modern CGL policy provides basic "premises and operations" coverage. This coverage insures for damages arising out of an occurrence at the insured's place of business as a result of the insured's ongoing business activities.[8] The risk covered by the CGL premises and operations coverage differs from the risk posed once an insured relinquishes its products to third parties or completes its work. This latter risk is insured, for an additional hefty premium, under the productscompleted operations hazard coverage.[9] The purpose of the products completed operations hazard coverage is to insure against the risk that the product or work, if defective, may cause bodily injury or damage to property of others after it leaves the insured's hands.[10]
Eastside Machine purchased only premises and operations coverage. Western National agreed to "pay those sums that the insured becomes legally obligated to pay as damages because of `bodily injury' or `property damage' to which this insurance applies." Productscompleted operations hazard risks are excluded such that the policy specifically excludes:
[A]ll "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except
(1) Products that are still in your physical possession; or
(2) Work that has not yet been completed or abandoned.
"Your work" will be deemed completed at the earliest of the following times:
(1) When all of the work called for in your contract has been completed.
(2) When all of the work to be done at the site has been completed if your contract calls for work at more than one site.
(3) When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.
Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete will be treated as completed.
The policy defines "Your product" as:
a. Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

*5 (1) You;
(2) Others trading under your name; or
(3) A person or organization whose business or assets you have acquired; and
b. Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.
"Your product" includes warranties or representations made at any time with respect to the fitness, quality, durability or performance of any of the items included in a. and b. above.
"Your product" does not include vending machines or other property rented to or located for the use of others but not sold.
The policy defines "Your work" as:
a. Work or operations performed by you or on your behalf; and
b. Materials, parts or equipment furnished in connection with such work or operations.
"Your work" includes warranties or representations made at any time with respect to the fitness, quality, durability or performance of any of the items included in a. or b. above.
Summary of Issues
We first consider whether the cylinder is Eastside Machine's product for purposes of the policy.[11] We next consider whether the productscompleted operations hazard exclusion applies to provision of services. In this context, we must decide whether Washington case law permits application of the exclusion to service providers, and if so, whether exclusion of both products and work renders the policy ambiguous here. This question also requires us to consider whether the policy is ambiguous regarding what work is covered and what work is excluded, and whether negligence renders work incomplete (and therefore covered) under the policy.
Eastside's Cylinder as a "Product"
Goodwin argues that the cylinder was not Eastside's product, and that instead, Eastside simply performed a repair service. He argues that Eastside was not the manufacturer of the component parts of the finished cylinder, and thus "provided no product whatsoever." Goodwin's reading of the exclusion is too narrow.
The policy defines "Your Product" as "[a]ny goods or products ... manufactured, sold, handled, distributed or disposed of by... [y]ou." The policy does not define any of these terms. Our Supreme Court considered essentially identical language regarding the definition of an insured's product in Olympic Steamship Co., Inc. v. Centennial Ins. Co.[12] For purposes of a sistership exclusion, the court adopted the definition of an "insured's product" from Paxton-Mitchell Co. v. Royal Indem. Co.:[13]
"What are `goods or products'? These two words standing alone have a meaning which is most commonly associated with the commercial world. They are most often thought of as some tangible or material units in which one trades. The qualifying words `manufactured, sold, handled or distributed' really do not broaden the ordinary meaning associated with these words, but limit `goods or products' to those in which the insured trades or deals."[14]
The court concluded: "We hold that an `insured's product' refers to goods or products in which the insured trades or deals, including goods created or manufactured by the insured."[15] The question, therefore, is whether the cylinder meets the Olympic *6 Steamship testthat is, whether it was traded or dealt or manufactured by Eastside.
We hold the cylinder satisfies this definition. The dictionary defines "manufacture" as "the process or operation of making wares or other material products by hand or by machinery esp. when carried on systematically with division of labor."[16] As Western National points out, "[t]he new cylinder did not exist before." Eastside made something useful from component parts, and sold it to Fruhling. The cylinder was both manufactured and traded, and was therefore Eastside's product.
It does not matter, for purposes of this analysis, that the item is made to order rather than made in bulk. This court previously considered whether the design and construction of a boathouse resulted in a product for purposes of a "products" exclusion in a CGL policy.[17] The insured was not in the ordinary business of building boathouses, but had in fact built one. Apparently either the design or construction was faulty. The boathouse blew away in a windstorm and destroyed nearby boats. The court held that the boathouse satisfied the policy definition of a product, and therefore the products exclusion barred coverage for damages to the boathouse.[18] Discussing the purpose of the products exclusion, the court observed: "A general liability policy is not intended to encompass the risk of an insured's failure to adequately perform work, i.e., a general liability policy is not a form of performance bond, product liability insurance, or malpractice insurance."[19]
The Westman court also considered whether the products hazard exclusion barred coverage for damages caused to third parties' boats by the boathouse. Holding the products hazard exclusion applicable, the court noted, "appellant cannot now seek coverage for a risk he specifically declined to purchase."[20]
Similarly here, whether or not Eastside was in the ordinary business of manufacturing cylinders, it nonetheless did so on this occasion. It also deliberately chose not to purchase coverage for off-premises damage arising from its defective products. Eastside made a tangible unit and sold it to Fruhling. The products hazard provision of the exclusion applies to Eastside's cylinder.
Goodwin also argues, however, that the products hazard exclusion does not apply where the insured's primary business is service. For this proposition, Goodwin relies on Prosser Comm'n. Co. v. Guaranty Nat'l. Ins. Co., a Division Three case.[21] Prosser was an insured who auctioned livestock. He sold a cow infected with brucellosis, which contaminated the customer's entire herd. The insurer denied coverage for the customer's damages based on the productscompleted operations hazard exclusion. In finding the exclusion did not apply to the auctioneer, the court noted the auctioneer was not involved in manufacturing or handling a product in its route through commerce, and that an average businessman would reasonably assume the provision related to workmanship on manufactured products, not to a diseased cow.[22] In passing, the court stated that, "the products hazard exclusion does not apply where the insured's business primarily involves a service."[23] Goodwin's argument rests on this statement.
*7 The Westman court squarely rejected the argument Goodwin makes here, and clarified that the Prosser court was "merely saying a products exclusion does not apply to damages arising from a business's provision of services."[24] The Westman court concluded: "Thus, we are convinced that a products exclusion applies to damages to an insured's product regardless of whether the insured's business also involves the provision of services."[25]
We agree with the Westman court. Prosser does not stand for the proposition that application of the products hazard exclusion depends on the nature of the insured's "primary" business. Rather, the Prosser court was merely reasoning from the facts there presented: the auction of a cow does not make the cow the auctioneer's product. Applying that reasoning to our facts leads to the result already articulated: making something new from component parts, by order of a customer for purposes of sale to the customer, is manufacture of a product for purposes of the policy.
Eastside's Cylinder as "Work"
The productscompleted operations hazard exclusion also excludes off-premises bodily injury resulting from "work," so long as the work has been completed. Goodwin characterizes the cylinder not as a product but the subject of Eastside's repair work, and alleges the work was never completed and therefore is covered. While we have held the cylinder was Eastside's product, and therefore excluded, we must address this argument because Goodwin contends that the application of the exclusion to both products and services creates an ambiguity which must be construed against the insurer.
Although the policy does not define the word "work," the dictionary definition, "an activity in which one exerts strength or faculties to do or perform," easily embraces a spectrum of service-oriented businesses.[26]
We first note that manufacturing is essentially impossible without performing "work," and that the exclusion is drafted to exclude either a product or work. Since an insured can hardly create or trade a product without performing "work," the average purchaser of insurance would necessarily understand that "product" is the narrower definition, and that once it is satisfied, the exclusion applies.
Goodwin argues, however, that viewed as work, the cylinder is not excluded because the work was incomplete and therefore covered, and that this anomalythat considered as a product, the cylinder is excluded, but considered as incomplete work, Eastside's repair service is coveredconstitutes an "inherent ambiguity." Goodwin characterizes this ambiguity as resulting from the policy's attempt "to shoe-horn a standard policy provision to cover both product manufacturers and service providers." Goodwin's argument that the work was incomplete depends in part upon two subordinate arguments: he argues that the policy provision defining when work is complete is itself ambiguous, and that negligence renders work incomplete.
Completed Work
The policy exclusion for completed work provides: "Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed." Goodwin contends this provision itself creates ambiguity because the broad scope of the phrase "otherwise complete" in effect "devours" covered, incomplete work. We disagree.
First, Goodwin relies on authorities interpreting policies dissimilar to Western National's in many respects.[27] None of the policies in those cases contains the language "your work." None provides separate definitions for "product" or "operations." None *8 defines when an operation or work is completed.[28]
In addition, Goodwin's authorities interpret pre-1966 policies, a distinction which is significant. The development of insurance protection for products liability parallels the development of products liability law.[29] Previously, the greatest risks a business faced arose from conditions or activities on the premises and from on-going activities off the premises.[30] Insurance protection for such risks was available in the "premises-operations" coverage.[31] Eastside purchased this type of coverage. With the fall of the privity requirement and the development of products liability law, a new coverage"products hazard"became available for injuries caused by products or operations away from the premises and after the insured had relinquished possession of the products.[32] This is the coverage Eastside's owner specifically declined to purchase because of its cost.
Despite these historical developments, courts were concluding that damage to other property as a result of deficient products or work was covered by pre-1966 policies because the pre-1966 versions of the "products hazard and completed operations" provisions were poorly drafted.[33] In 1966, the insurance industry revised its standard policies to clarify the scope of the "productscompleted operations" coverage.[34] Thus, pre-1966 case law is not helpful to our analysis.
While the arguments have differed, courts in other jurisdictions faced with ambiguity challenges to the standard language of post-1966 productscompleted operations exclusions have held the language unambiguous. For example, the Supreme Court of Connecticut held that the exact wording at issue here is clear and unambiguous.[35] The Court of Appeals of Oregon found a similar exclusion unambiguous.[36]
Finally, as evidence of ambiguity, Goodwin points to Western National's alleged failure to identify a factual scenario in which incomplete work would be covered. But this is not Western National's burden (although we note its brief includes several plausible examples).
The key policy language is plain: "Work that may need ... correction ... but which is otherwise complete will be treated as complete." Eastside's efforts were completed. Nothing in the evidence indicates an ongoing process. Eastside delivered the cylinder, Fruhling paid for it. The parties to the transaction obviously treated Eastside's undertaking as complete, since both contemplated the cylinder would be immediately put to use. We discern no ambiguity here.
Negligence Rendering Work "Incomplete"
Goodwin finally argues that whether or not there is an ambiguity in the completed work provision, Eastside's work was incomplete because a "critical operation" was omitted by Eastside (to wit, a lock ring between cylinder stages was either not installed, or was improperly welded). Goodwin urges us to hold that where an insured omits a "critical operation," the work is incomplete as a matter of law and the exclusion does not apply. We find Goodwin's authorities inapposite or unpersuasive, and reject his argument because it would render the productscompleted operations exclusion, as well as the separate coverage for this hazard, meaningless.
*9 Washington courts have not considered whether a negligent omission or act renders work incomplete for purposes of the completed operations exclusion in a CGL policy. Nationally, as a general rule, a contract or operation is deemed completed "when the work contracted for or undertaken has been finished, and put to its intended use."[37] "As a rule, the argument that an operation negligently performed cannot be a `completed operation' has been rejected."[38] While there is authority for the notion that, in actions involving failure to warn customers of product hazards or to provide installation instructions, damages resulting from negligent omissions are covered because the operations were considered incomplete, we are not presented with such a case here.[39]
The majority of Goodwin's authority is distinguishable. Several of the cases involve dissimilar policies. For example, the North Carolina decision cited by Goodwin relies solely on a pre-1966 North Carolina case, and the court does not consider the effect of the 1966 amendments.[40] The Texas Court of Appeals interpreted a policy that did not indicate when work was considered complete.[41] When that court later considered a policy that indicated when work was complete, the court rejected its earlier decision.[42]
In cases from Georgia and Oklahoma, there was direct evidence that the work was incomplete. For example, in Southern Guar. Ins. Co. of Ga. v. Jeffares, the installer testified his work was not complete.[43] There also was testimony that the service was not yet complete in Nogales Ave. Baptist Church v. Peyton.[44] Here, the record contains no such issue of fact. Goodwin's other authorities involved service and rental contracts, which render the work incomplete.[45]
Finally, Goodwin relies on a Louisiana case, Ada Resources, Inc. v. Don Chamblin & Assoc. Inc.[46] There, the court considered whether damage arising from an alleged negligently threaded cross-over joint for an oil well was unambiguously excluded from coverage under a products hazard or completed operations exclusion such that the insurer had no duty to defend. Relying on a previous Louisiana case involving failure to warn,[47] the Louisiana Court of Appeals reasoned that because neither the products hazard nor completed operations exclusions specifically excluded "negligent omissions," and the negligence at issue was "in the nature of a general risk of doing business which comprehensive general liability policies seek to cover," that type of risk was covered by the policy.[48]
This reasoning is unpersuasive. A CGL policy does not cover all the risks of doing business. As the North Carolina Court of Appeals noted: "If negligence prevents an operation from being complete until the negligence is detected, then the completed *10 operations hazard exclusion would be illusory and the insurer's liability would extend far beyond the limits of the intended coverage."[49]
Goodwin's argument ignores both the language of the policy and the purpose and availability of the separate productscompleted operations hazard coverage, which Eastside did not purchase. Eastside's policy covered only damages arising on the premises of his business due to his products or completed operations. If his basic policy is read to cover off-premises damages arising from negligent omissions or acts, the productscompleted operations hazard exclusion is meaningless, and the separate coverage available for this hazard is superfluous.
We thus reject Goodwin's subordinate ambiguity and negligence arguments. As applied here, the policy does not exclude coverage under the products hazard provision and at the same time grant coverage for damages arising from incomplete work, because here the work is complete.[50] We thus return to our basic holding. The cylinder was a product and damages caused by the cylinder are excluded under the productscompleted operations hazard exclusion. If considered under the completed operations exclusion, Eastside's work was complete and therefore excluded. The trial court did not err in determining coverage was barred.
Goodwin's Motion to Strike
On appeal, Goodwin moved to strike a portion of Western National's brief because it contained hearsay stricken by the trial court.[51] The trial court ordered stricken "that portion of Leonard Flanagan's Affidavit and that portion of the Declaration of Bob Mullin which attempts to incorporate the recorded statement highlights of Jeff Hoyle and the recorded statement highlights of Kenneth Goodwin." Western National argued RAP 9.12 permits appellate review of the stricken material.
RAP 9.12 specifies what the record must contain on appeal from an order granting or denying summary judgment:
On review of an order granting or denying a motion for summary judgment the appellate court will consider only evidence and issues called to the attention of the trial court. The order granting or denying the motion for summary judgment shall designate the documents and other evidence called to the attention of the trial court before the order on summary judgment was entered. Documents or other evidence called to the attention of the trial court but not designated in the order shall be made a part of the record by supplemental order of the trial court or by stipulation of counsel.
Courts have read and applied RAP 9.12 quite literally. Evidence called to the attention of the trial court is properly before us, whether or not it was considered by the trial court.[52] The contested declaration here was called to the attention of the trial court, and is included in the court's list of documents it considered. We thus conclude the reference in Western National's brief is not technically improper. The material is, however, objectionable hearsay, and the trial court did not err in refusing to consider it. We further find it irrelevant to our analysis.
Attorney's Fees
Western National requests attorney fees and costs on appeal. Goodwin does not contest this request, and under RCW 6.27.230, *11 fees and costs are mandatory. Western National is ordered to comply with RAP 18.1.
Affirmed.
BAKER, J., and APPELWICK, J., concur.
NOTES
[1] After the accident, Eastside Machine filed bankruptcy. During the pendency of the bankruptcy, Goodwin filed suit against Eastside and its owners, obtained a default judgment against them, and served on Western National a writ of garnishment for the default judgment. Western National answered, denying coverage, and asserting the judgment was void because it violated the automatic bankruptcy stay and that the statute of limitations had expired. In September 1997, a federal bankruptcy court granted retroactive relief from the stay.
[2] McDonald v. State Farm Fire & Cas. Co., 119 Wash.2d 724, 730, 837 P.2d 1000 (1992).
[3] Grange Ins. Co. v. Brosseau, 113 Wash.2d 91, 95, 776 P.2d 123 (1989); Schwindt v. Underwriters at Lloyd's of London, 81 Wash.App. 293, 297-98, 914 P.2d 119 (1996).
[4] Allstate Ins. Co. v. Peasley, 131 Wash.2d 420, 424, 932 P.2d 1244 (1997); Schwindt, 81 Wash. App. at 298, 914 P.2d 119.
[5] Peasley, 131 Wash.2d at 424, 932 P.2d 1244.
[6] McDonald, 119 Wash.2d at 733, 837 P.2d 1000.
[7] Peasley, 131 Wash.2d at 424, 932 P.2d 1244.
[8] See Roger C. Henderson, Insurance Protection for Products Liability and Completed Operations What Every Lawyer Should Know, 50 NEB. L.REV. 415 (1971).
[9] Henderson, supra, at 426.
[10] Henderson, supra, at 441.
[11] The trial court did not rule on this issue. While it was discussed in the briefing below, the parties and the court focused instead on the question of whether the policy covered Fruhling's "work." Both issues are before us on appeal.
[12] Olympic Steamship Co., Inc. v. Centennial Ins. Co., 117 Wash.2d 37, 811 P.2d 673 (1991).
[13] Paxton-Mitchell Co. v. Royal Indem. Co., 279 Or. 607, 569 P.2d 581 (1977).
[14] Olympic Steamship, 117 Wash.2d at 49, 811 P.2d 673 (quoting Paxton-Mitchell, 569 P.2d at 586) (citation omitted).
[15] Olympic Steamship, 117 Wash.2d at 50, 811 P.2d 673.
[16] WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY of the english language 1378 (1993).
[17] Westman Indus. Co. v. Hartford Ins. Group, 51 Wash.App. 72, 77-83, 751 P.2d 1242 (1988). A products exclusion bars coverage for damages to the insured's own products, whereas the exclusion at issue here bars coverage to damage to third parties arising from the insured's product, and is usually referred to as a products hazard or products liability exclusion. The Westman products exclusion read: "This insurance does not apply: ... (n) to property damage to the named insured's products arising out of such products or any part of such products[.]" Westman, 51 Wash. App. at 77, 751 P.2d 1242 (emphasis added).
[18] Westman, 51 Wash.App. at 81, 751 P.2d 1242.
[19] Westman, 51 Wash.App. at 80, 751 P.2d 1242.
[20] Westman, 51 Wash.App. at 82-83, 751 P.2d 1242.
[21] Prosser Comm'n Co. v. Guaranty Nat'l. Ins. Co., 41 Wash.App. 425, 700 P.2d 1188 (1985).
[22] Prosser, 41 Wash.App. at 432, 700 P.2d 1188.
[23] Prosser, 41 Wash.App. at 431, 700 P.2d 1188.
[24] Westman, 51 Wash.App. at 81, 751 P.2d 1242.
[25] Westman, 51 Wash.App. at 81, 751 P.2d 1242.
[26] WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY of the English Language 2634 (1993).
[27] Goodwin relies on McNally v. American States Ins. Co., 308 F.2d 438 (6th Cir.1962); Hays v. Pacific Indem. Group, 8 Cal.App.3d 158, 86 Cal. Rptr. 815 (1970), and Nixon v. United States Fidelity & Guar., 290 So.2d 26 (Fla.1973).
[28] These policies define what is not an operation and what is not incomplete. McNally, 308 F.2d at 441; Hays, 86 Cal.Rptr. at 817; Nixon, 290 So.2d at 27-28.
[29] See Roger C. Henderson, Insurance Protection for Products Liability and Completed Operations What Every Lawyer Should Know, 50 NEB. L. REV. 415, 416 (1971).
[30] Henderson, supra, at 417.
[31] Henderson, supra, at 417.
[32] Henderson, supra, at 418.
[33] Henderson, supra, at 436.
[34] Henderson, supra, at 436-37.
[35] Flint v. Universal Machine Co., 238 Conn. 637, 679 A.2d 929 (1996) (holding productscompleted operations exclusion bars coverage for injury resulting from the negligent repair of a machine press).
[36] Boyer Metal Fab., Inc. v. Maryland Cas. Co., 90 Or.App. 103, 750 P.2d 1195 (1988) (holding "productscompleted operations" exclusion bars coverage of injury resulting from the negligent fitting of metal plates).
[37] 9 LEE R. RUSS & THOMAS F. SEGALLA, COUCH ON INSURANCE § 129:15 (3d ed. 1995) (footnotes omitted).
[38] 9 RUSS & SEGALLA, supra, § 129:17.
[39] See 9 RUSS & SEGALLA, supra, § 129:18 (citing cases from Louisiana, North Carolina, and Texas).
[40] Woodard v. North Carolina Farm Bur. Mut. Ins. Co., 44 N.C.App. 282, 261 S.E.2d 43 (1979) (relying on Daniel v. Casualty Co., 221 N.C. 75, 18 S.E.2d 819 (1942)).
[41] Fidelity & Cas. Co. v. Horton & Horton Custom Works, Inc., 462 S.W.2d 613 (Tex.App.1971, writ ref'd n.r.e).
[42] Hargis v. Maryland Am. Gen. Ins. Co., 567 S.W.2d 923, 925 (Tex.App. 1978, writ ref'd n.r.e).
[43] Southern Guar. Ins. Co. of Ga. v. Jeffares, 190 Ga.App. 449, 379 S.E.2d 167 (1989).
[44] Nogales Ave. Baptist Church v. Peyton, 576 P.2d 1164 (Okla.1978).
[45] See e.g., Houston Bldg. Serv., Inc. v. American Gen. Fire & Cas. Co., 799 S.W.2d 308 (Tex.App. 1990, writ denied) (on-going service contract); Surdyka v. DeWitt, 784 P.2d 819 (Colo.App.1989) (defective equipment under a rental contract).
[46] Ada Resources, Inc. v. Don Chamblin & Assoc. Inc., 361 So.2d 1339 (La.Ct.App.1978).
[47] Cooling v. United States Fidelity & Guar. Co., 269 So.2d 294 (La.Ct.App.3d Cir.1972) (failure to warn of need for safety devices on diesel engines not excluded from coverage under products hazard exclusion).
[48] Ada Resources, 361 So.2d at 1343-44.
[49] Deason v. J. King Harrison Co. Inc., 127 N.C.App. 514, 491 S.E.2d 666, 668 n. 2 (1997) (citing Henderson, supra, at 436-38).
[50] Whether such a result could ever occur, given the structure of the definitions in the policy, is not before us.
[51] Goodwin objects to the unsworn statement of Fruhling's mechanic taken by an insurance adjuster on the date of the accident and presented to the court in a declaration by the adjuster's coworker. In the statement, Fruhling's mechanic stated the hydraulic cylinder was installed and tested three times before it was put "on line."
[52] See Mithoug v. Apollo Radio of Spokane, 128 Wash.2d 460, 909 P.2d 291 (1996).