[No. 52943-9-I. Division One. August 16, 2004.]

MUTUAL OF ENUMCLAW INSURANCE COMPANY, *Respondent*, v. PATRICK ARCHER CONSTRUCTION, INC., ET AL., *Appellants*.

*John P. Mele* and *Robert J. Curran* (of *Ryan, Swanson & Cleveland, P.L.L.C.*), for appellants.

*Brent W. Beecher* (of *Hackett Beecher & Hart*), for respondent.

Cox, C.J. — Patrick Archer Construction (Archer) and Patrick Archer and Jane Doe Archer appeal the trial court order granting Mutual of Enumclaw's (MOE's) motion for summary judgment and denying their CR 56(f) motion to continue. Because the trial court did not abuse its discretion in denying the motion to continue and MOE has established that the policy exclusion for "products" under the commercial general liability (CGL) insurance policy controls, we affirm.

Archer is a licensed general contractor. MOE issued to it a CGL policy with a Broad Form Extended Liability Endorsement for contractual liability for the period relevant to this action.

In 1995, Patrick Archer, Charles Teel, and Bruce Robertson formed TRA Associates (TRA), to develop the Sjonadal Condominiums. TRA contracted with Archer to serve as the general contractor/construction supervisor for this condominium project. TRA sold the units to purchasers.

Following completion of construction of the project, construction defects were apparent. Problems with the siding resulted in damage to the building itself and personal property within the building. The Sjonadal Condominium Association sued TRA. TRA brought a third party claim against Archer. Archer tendered the claim to MOE under its CGL policy, and MOE defended Archer under a reservation of rights. MOE commenced this declaratory judgment action to determine whether coverage existed under its policy with Archer.

MOE moved for summary judgment. Archer opposed the motion with declarations and other evidence, and moved to

continue pursuant to CR 56(f) to permit additional discovery on alleged missing endorsements to the policy. The trial court denied Archer's motion to continue and granted MOE's motion for summary judgment. The trial court also denied Archer's motion for reconsideration.

Archer appeals.

## PRODUCTS EXCLUSION

Archer contends that the products exclusion clause of the insurance policy does not control. Archer is mistaken.

■ In our de novo review of an order granting summary judgment, we consider all evidence and reasonable inferences in the light most favorable to the nonmoving party.[1] Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.[2]

■■ To prevail, Archer must first establish that the loss falls within the scope of the policy's insured losses.[3] To avoid responsibility for the loss, MOE must then show that the loss is excluded by specific language in the policy.[4] A "general liability policy 'does not insure the contractor against his own failure to perform his contract.' "[5] We construe narrowly exclusions in an insurance policy.[6]

---

[1] *Mountain Park Homeowners Ass'n v. Tydings*, 125 Wn.2d 337, 341, 883 P.2d 1383 (1994).

[2] CR 56(c).

[3] *McDonald v. State Farm Fire & Cas. Co.*, 119 Wn.2d 724, 731, 837 P.2d 1000 (1992).

[4] *Diamaco, Inc. v. Aetna Cas. & Sur. Co.*, 97 Wn. App. 335, 337, 983 P.2d 707 (1999), *review denied*, 140 Wn.2d 1013 (2000).

[5] *Westman Indus. Co. v. Hartford Ins. Group*, 51 Wn. App. 72, 80, 751 P.2d 1242 (quoting *Eulich v. Home Indem. Co.*, 503 S.W.2d 846, 849 (Tex. Civ. App. 1973)), *review denied*, 110 Wn.2d 1036 (1988).

[6] *Vadheim v. Cont'l Ins. Co.*, 107 Wn.2d 836, 841, 734 P.2d 17 (1987).

MOE does not contest that the loss falls within the insuring terms of the policy. Clearly, property damage is involved for the occurrence at issue here.[7]

Rather, the applicability and scope of the products exclusion is at issue. That exclusion states: "[t]his insurance does not apply: . . . (n) to property damage to the named insured's products arising out of such products or any part of such products." "Named insured's products" is defined as "goods or products *manufactured*, sold, *handled* or distributed by the named insured or by others trading under his named [sic] . . . ."[8] "Products" itself is not defined in the policy, but our court has previously defined this as " 'goods which are processed or assembled in the ordinary channels of commerce' " for purposes of an insurance policy.[9]

CGL insurance policies "exclude the insured's faulty workmanship from coverage. The rationale for such exclusions is that faulty workmanship is not an insurable 'fortuitous event,' but a business risk to be borne by the insured."[10]

■ ■ "Washington case law interprets such product exclusions to encompass entire buildings as defective products. This view is consistent with Washington courts' reluctance to interpret such general liability policies as a form of performance bond, product liability insurance, or malpractice insurance."[11] A building constructed by a builder is its

---

[7] The insuring clause of the policy provides in part: "The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of A. bodily injury or B. property damage to which this insurance applies, caused by an occurrence . . . ." Clerk's Papers at 202.

[8] Clerk's Papers at 204 (emphasis added).

[9] *Westman*, 51 Wn. App. at 78 (quoting *Prosser Comm'n Co. v. Guar. Nat'l Ins. Co.*, 41 Wn. App. 425, 431, 700 P.2d 1188 (1985)).

[10] 9 LEE R. RUSS, COUCH ON INSURANCE § 129:11, at 129-21 (3d ed. 1997); *see, e.g.*, *Olds-Olympic, Inc. v. Commercial Union Ins. Co.*, 129 Wn.2d 464, 478-79, 918 P.2d 923 (1996) (concerning "owned property" exclusion).

[11] *Schwindt v. Underwriters at Lloyd's of London*, 81 Wn. App. 293, 302, 914 P.2d 119, *review denied*, 130 Wn.2d 1003 (1996).

product, for purposes of a products exclusion.[12] "[A] products exclusion applies to damages to an insured's product regardless of whether the insured's business also involves the provision of services."[13]

A threshold question in this motion is the role that Archer assumed in the project. It opposed the motion for summary judgment, in part, based on the contention that it "did not build or manufacture the Sjonadal Condominiums."[14] Moreover, it contended that it only provided "construction management services."[15] This argument is unpersuasive.

▪ Pat Archer testified at deposition that Archer was the general contractor on the Sjonadal project. "Q. Now, was Patrick Archer Construction the general contractor on the Sjonadal project? A. I'd say so." Although his declaration in opposition to the motion for summary judgment appears to back away from this clear response to a clear question, such an approach does not create a genuine issue of material fact on the role of Archer during the project.[16]

In any event, Pat Archer also testified at his deposition that, "Pat Archer Construction would fill in where the subcontractors weren't able to. So Pat Archer Construction was basically like an air traffic controller, trying to make sure that all the planes would arrive on time and get their job done." Specifically, Archer performed soffit and wall flashing work and "a lot of cleanup" at Sjonadal. This testimony shows that Archer was not just providing services for the project. It was actively involved in constructing it.

Other evidence supports the conclusion that Archer built the project. Bruce Robertson testified that Archer was the

---

[12] *Federated Serv. Ins. Co. v. R.E.W., Inc.*, 53 Wn. App. 730, 735, 770 P.2d 654 (1989).

[13] *Westman*, 51 Wn. App. at 81.

[14] Clerk's Papers at 168.

[15] Clerk's Papers at 168.

[16] *Klontz v. Puget Sound Power & Light Co.*, 90 Wn. App. 186, 192, 951 P.2d 280 (1998) (to the extent a subsequent declaration contradicts prior deposition testimony, a genuine issue of material fact on the issue does not arise).

general contractor on the project, was responsible for assembling the subcontractors, and oversaw the work done by subcontractors on Sjonadal. Robertson further testified, "All construction aspects were gone [sic] through Pat of Archer Construction." Charles Teel testified that TRA hired Archer by oral agreement to "build the condo." When asked whether it was "up to Pat Archer to either perform or delegate construction tasks" on Sjonadal, Teel replied, "Yes. Pat Archer, Pat Archer Construction, that entity . . . just he [sic] as Pat Archer Construction."

Lastly, in response to interrogatories in the underlying lawsuit, TRA responded:

> TRA employed Patrick Archer Construction *as general contractor* for this project. Patrick Archer Construction performed construction related activities for the benefit of the project from approximately 9/6/95 to 4/97. On information and belief, Patrick Archer Construction employed agents and/or contractors to perform construction related activities for the benefit of the project. On information and belief, Patrick Archer Construction organized sub-trades, acquired bids, accepted bids, set schedules for work to be performed, and supervised construction.[17]

In *Schwindt*, this court addressed in part whether a building is a general contractor's product when subcontractors performed some of the construction work.[18] Noting that to hold otherwise would not reflect the realities of the commercial construction process, we held that the work of subcontractors is necessarily included in exclusions pertaining to faulty work or defective products of the contractor.[19]

That reasoning is applicable here. TRA contracted with Archer to build Sjonadal. Archer chose to rely substantially on subcontractors to perform the work. Archer was responsible for supervising and for ensuring that the work was

---

[17] (Emphasis added.)

[18] *Schwindt v. Underwriters at Lloyd's of London*, 81 Wn. App. 293, 305, 914 P.2d 119, *review denied*, 130 Wn.2d 1003 (1996).

[19] *Schwindt*, 81 Wn. App. at 306.

completed. There can be no question that the quality of the work performed, both by Archer as well as by its subcontractors, was the responsibility of Archer and no one else.

Even if Archer did provide some services, *Westman* dictates that the products exclusion applies "regardless of whether the insured's business also involves the provision of services."[20] There is no other conclusion but that Sjonadal is Archer's product.

Accordingly, there is no genuine issue of material fact regarding the role Archer assumed in this case. It was the general contractor, acting as such. And case authority supports our conclusion that the alleged defective product—the building—falls within the policy exclusion for products of the insured.

Nevertheless, Archer cites the payment arrangement between itself and TRA to support its argument that genuine issues of material fact exist. Archer points to its flat monthly "supervision fee" of $2,500 and the fact that payments to it represented only a fraction of the total costs of the project. Neither of these facts is material.

To the extent Archer is trying to use the payment arrangement to argue that it was not the general contractor, the deposition testimony and interrogatory responses defeat this contention. And the fact that the money did not flow first to Archer and then to the subcontractors does not create a genuine issue of material fact concerning whether Sjonadal is Archer's product. Archer does not cite any authority to support this proposition.

Furthermore, Archer's contention that it was TRA that "manufactured, sold, handled or distributed" Sjonadal is not persuasive in light of the facts of this case and case authority defining a building as a builder's product. Archer both "manufactured" and "handled" Sjonadal. The fact that TRA sold the units does not change the conclusion that Sjonadal is Archer's product.

---

[20] *Westman Indus. Co. v. Hartford Ins. Group*, 51 Wn. App. 72, 81, 751 P.2d 1242, *review denied*, 110 Wn.2d 1036 (1988).

Archer argues for the first time in its reply brief that MOE cannot rely on the deposition testimony and interrogatory responses of Archer, Patrick Archer, Robertson, or Teel because any characterization of Archer as the "general contractor" is a legal conclusion that is inadmissible. We disagree with Archer's characterization of this term as a legal conclusion. Moreover, the cases on which Archer relies are inapposite and do not support its argument.[21] Accordingly, we reject this unpersuasive argument, first asserted in a reply brief.

Sjonadal is Archer's product and the products exclusion in Archer's CGL policy applies.

## BROADFORM EXTENDED LIABILITY ENDORSEMENT

Archer next argues that the Broadform Extended Liability (BFL) Endorsement provides coverage for its role as a construction supervisor, even if Sjonadal is its product. We disagree.

■■ The proper interpretation of an insurance policy is a question of law that we review de novo.[22] This court will give a policy a fair, reasonable, and sensible construction as would be given by the average person purchasing insurance.[23]

■ The BFL Endorsement extends the definition of "incidental contract" to include "any contract or agreement

---

[21] *See State v. Thompson,* 90 Wn. App. 41, 46, 950 P.2d 977 (officer's testimony as to the defendant's guilt inadmissible), *review denied,* 136 Wn.2d 1002 (1998); *Charlton v. Day Island Marina, Inc.,* 46 Wn. App. 784, 788, 732 P.2d 1008 (1987) (experts are not permitted to state a legal opinion, " 'such as X was negligent' " (quoting *Hiskey v. City of Seattle,* 44 Wn. App. 110, 113, 720 P.2d 867 (1986))); *Ward v. Westland Plastics, Inc.,* 651 F.2d 1266, 1270-71 (9th Cir. 1980) (expert testimony that appellant was discriminated against inadmissible); *Orion Corp. v. State,* 103 Wn.2d 441, 461-62, 693 P.2d 1369 (1985) ("Experts are not to state opinions of law."), *cert. denied,* 486 U.S. 1022 (1988); *Am. Linen Supply Co. v. Nursing Home Bldg. Corp.,* 15 Wn. App. 757, 763, 551 P.2d 1038 (1976) (legal conclusions in an attorney's affidavit are to be disregarded).

[22] *McDonald,* 119 Wn.2d at 730-31.

[23] *Roller v. Stonewall Ins. Co.,* 115 Wn.2d 679, 682, 801 P.2d 207 (1990).

relating to the conduct of the named insured's business." The endorsement also addresses which of the CGL policy's exclusions will not apply to this endorsement. In identifying those that do not apply, the endorsement expressly states: "The following exclusions applicable to Bodily Injury and Property Damage coverages do not apply to this Contractual Liability Coverage: (b), (c) (2), (d) and (e) of the Comprehensive General Liability . . . ." Significantly, exclusion (n), the products exclusion is not listed as an exclusion inapplicable to the policy. Therefore, the only reasonable construction an average person purchasing insurance could give to the BFL endorsement is that the expanded coverage for contractual liability is subject to the products exclusion.

Archer cannot defeat the specific CGL products exclusion by citing the general grant of contractual liability coverage in the BFL Endorsement.[24] The BFL Endorsement is subject to the products exclusion and does not provide coverage in this situation.

## EFFICIENT PROXIMATE CAUSE

Archer next contends that even if Sjonadal is its product, coverage exists under efficient proximate cause because the triggering event, Archer's alleged failure to properly inspect, is a covered event. We hold that efficient proximate cause has no application to this situation.

> Where a peril specifically insured against sets other causes in motion which, in an unbroken sequence and connection between the act and final loss, produce the result for which recovery is sought, the insured peril is regarded as the "proximate cause" of the entire loss.

---

[24] *See, e.g., Cle Elum Bowl, Inc. v. N. Pac. Ins. Co.*, 96 Wn. App. 698, 705, 981 P.2d 872 (1999) ("First, specific provisions in an insurance contract control over general provisions. [The] exclusion of damage to property rented by the insured is clear and specific and relates directly to the purpose of a general commercial liability policy: coverage for tort liability to third parties and other property. [This] specific exclusion . . . is not rendered ambiguous by the general terms of the exclusion [for contractual liability] or its exception [for a lease or insured contract]." (citations omitted)), *review denied*, 139 Wn.2d 1019 (2000).

It is the efficient or predominant cause which sets into motion the chain of events producing the loss which is regarded as the proximate cause, not necessarily the last act in a chain of events.[25]

"[W]here an insured risk itself sets into operation a chain of causation in which the last step may have been an excepted risk, the excepted risk will not defeat recovery."[26]

■ In its reply brief, Archer properly concedes that Washington courts have concluded that the efficient proximate cause rule does not apply to insurance exclusions that employ the term "arising out of."[27] Nevertheless, it asks this court to reconsider. We decline to do so.

Nevertheless, Archer contends that *Bowers v. Farmers Insurance Exchange*[28] is analogous to this case. It is mistaken. In *Bowers*, a landlord sought coverage under her insurance policy for mold and other damage to her property caused by tenants who established a marijuana grow operation in the basement.[29] The question presented was whether the tenants' vandalism of the house, a covered peril, or the mold that resulted from the vandalism, an excluded peril, was the cause of her loss.[30] The court concluded that the vandalism was the efficient proximate cause of the loss and that coverage existed.[31]

---

[25] *Graham v. Pub. Employees Mut. Ins. Co.*, 98 Wn.2d 533, 538, 656 P.2d 1077 (1983) (citations omitted).

[26] *Villella v. Pub. Employees Mut. Ins. Co.*, 106 Wn.2d 806, 815, 725 P.2d 957 (1986).

[27] *Toll Bridge Auth. v. Aetna Ins. Co.*, 54 Wn. App. 400, 407, 773 P.2d 906 (1989) ("'To construe 'arising out of' as requiring a finding of 'proximate cause' before we would know whether the accident arose out of the use or operation of the vessel does violence to the plain language of the policy. 'Arising out of' and 'proximate cause' describe two different concepts. . . . A determination of proximate cause is not a necessary precedent to determination of coverage in this case.").

[28] 99 Wn. App. 41, 991 P.2d 734 (2000).

[29] *Bowers*, 99 Wn. App. at 43.

[30] *Bowers*, 99 Wn. App. at 47.

[31] *Bowers*, 99 Wn. App. at 48.

 There is no question here which peril is the alleged cause of damage because there is only one event, Archer's role in the construction of Sjonadal. When there is but one cause, although susceptible to various characterizations, efficient proximate cause is not applicable.[32] The trial court did not err.

## AMBIGUOUS POLICY LANGUAGE

Archer also argues that MOE's policy language, contained in form L 6394a, is ambiguous and this court must construe it in its favor. We conclude that there is no ambiguous policy language.

 An insurance policy provision is ambiguous when it is fairly susceptible to two different interpretations, both of which are reasonable.[33] Provisions are not inconsistent or ambiguous merely because an insured must examine several provisions to determine the scope of coverage.[34] We construe ambiguities in insurance contracts in favor of the insured.[35]

Archer contends that the blank portion of the schedule of premiums in the CGL policy related to coverage for "products hazards" would lead an insured to assume that their operations do not result in products. This argument is not persuasive.

Nothing in the premium worksheet forecloses the fact that Archer created a product. Nor does it state that if Archer creates a product, the exclusion, which itself is not ambiguous, would not apply.

---

[32] *Chadwick v. Fire Ins. Exch.*, 17 Cal. App. 4th 1112, 1117, 21 Cal. Rptr. 2d 871 (1993).

[33] *Lynott v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 123 Wn.2d 678, 690, 871 P.2d 146 (1994).

[34] *Mut. of Enumclaw Ins. Co. v. Grimstad-Hardy*, 71 Wn. App. 226, 235, 857 P.2d 1064 (1993), *review denied*, 123 Wn.2d 1017 (1994).

[35] *Weyerhaeuser Co. v. Aetna Cas. & Sur. Co.*, 123 Wn.2d 891, 897, 874 P.2d 142 (1994).

Furthermore, the premium schedule provides: "[t]he following discloses all hazards insured hereunder known to exist at the effective date of this policy, *unless otherwise stated herein.*"[36] Thus, Archer's contention that a reasonable insured could look only at the premium worksheet to know the scope of coverage is erroneous. Archer cannot rely on this portion of the policy alone and ignore other provisions in the policy, specifically the definition of "named insured's products."[37]

Similarly, Archer's contention that it does not create a product because MOE characterized its income as "receipts" (completed operations hazard) instead of "sales" (product hazard) on the premium worksheet is not persuasive. The policy exclusion is not ambiguous and the treatment by MOE does nothing to change that.

■ Archer also contends that MOE's subsequent performance supports its interpretation of the policy language, which this court should consider as extrinsic evidence. But extrinsic evidence may not modify or contradict a written contract in the absence of fraud, accident, or mistake.[38] Archer's sole purpose in offering extrinsic evidence is to contradict the unambiguous products exclusion.[39] There is no allegation of fraud, accident, or mistake.

We conclude that there is no ambiguity in the policy that affects the products exclusion provision with which we deal in this instance.

---

[36] (Emphasis added.)

[37] " 'Named insured's products' is defined as 'goods or products manufactured, sold, handled or distributed by the named insured or by others trading under his named [sic] . . . .' ".

[38] *In re Marriage of Schweitzer*, 132 Wn.2d 318, 327, 937 P.2d 1062 (1997); *U.S. Life Credit Life Ins. Co. v. Williams*, 129 Wn.2d 565, 569-70, 919 P.2d 594 (1996) (citing *Berg v. Hudesman*, 115 Wn.2d 657, 669, 801 P.2d 222 (1990)).

[39] Archer cites MOE's 1997 audit of its operations in which MOE uses the same numeric codes on its Liability Audit Worksheet as the codes used on form L 6394a. Archer also argues that the exemplar copy of form L 6394a provided by MOE, does not allocate any funds to a products hazard, raising the question of whether it was MOE's standard practice not to associate "products hazards" with construction activities.

ADDITIONAL COVERAGE

Archer next contends that genuine issues of material fact exist concerning possible additional coverage for Independent Contractors and Completed Operations/Products Liability that remained unresolved because the trial court granted MOE's motion for summary judgment. We disagree.

■■■ Completed Operations/Products Liability coverage "is to insure against the risk that the product or work, if defective, may cause bodily injury or damage *to property of others* after it leaves the insured's hands."[40] It does not provide coverage for the completed product itself, contrary to Archer's assertion.

MOE does not dispute that it provided Archer with Independent Contractor and Completed Operations/Products Liability coverage as part of the CGL policy, for which Archer paid additional premiums. But MOE contends, and the record supports, that these were subject to the products exclusion at issue here.

Form L 6394a, which evidences Archer's purchase of its CGL policy, allows for coverage under that policy for Completed Operations and Independent Contractors. Coverage for these hazards is part of the CGL policy and does not require additional endorsements. MOE has never sold an additional endorsement to add this coverage to form L 6394a, because an additional endorsement would be redundant. There is a separate endorsement, form L 9141, which removes coverage for Completed Operations and Independent Contractors if the insured chooses not to pay for them. That endorsement is not part of Archer's policy because it did pay for the coverage.

Archer relies on little more than speculation to support its contention that genuine issues of material fact exist. It

---

[40] *Goodwin v. Wright*, 100 Wn. App. 631, 635-36, 6 P.3d 1 (2000) (emphasis added); 9 LEE R. RUSS, COUCH ON INSURANCE 3d, § 129:14 at 129-29 (1997) (" 'Completed operations' provisions refer to bodily injury and property damage which occur away form [sic] premises owned or controlled by the insured after the insured has completed work or relinquished custody of its product.").

points to the Premium Recap, which states that $119 of the $1,338 total premium paid was for Completed Operations and $75 of the $1,338 was for Independent Contractor coverage. But there is no support in the document for Archer's contention that the premiums were for *additional* endorsements or coverage outside of the CGL policy.

Archer Construction fails to establish that there are any missing endorsements. As part of the underlying CGL policy, coverage for Completed Operations and Independent Contractors are necessarily subject to the products exclusion. And Completed Operations applies to damage *caused* by the product, not to damage to the product itself.

There is no genuine issue of material fact concerning possible additional coverage for the loss at issue here.

## CR 56(f)

Archer contends that the trial court abused its discretion when it denied its CR 56(f) motion to permit discovery on the question of possible additional coverage. The trial court did not abuse its discretion.

CR 56(f) states:

> Should it appear from the affidavits of a party opposing the motion that he cannot, for reasons stated, present by affidavit facts essential to justify his opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

We review a trial court's decision regarding a CR 56(f) motion for abuse of discretion.[41] " 'A court may deny a motion for a continuance when . . . (3) the desired evidence will not raise a genuine issue of material fact' "[42]

---

[41] *Colwell v. Holy Family Hosp.*, 104 Wn. App. 606, 615, 15 P.3d 210, *review denied*, 144 Wn.2d 1016 (2001).

[42] *Colwell* 104 Wn. App. at 615 (quoting *Tellevik v. Real Prop. Known as 31641 W. Rutherford St.*, 120 Wn.2d 68, 90, 838 P.2d 111 (1992)).

The trial court did not abuse its discretion because the desired evidence does not raise a genuine issue of material fact. As explained above, the Completed Operations and Independent Contractor coverage provided by MOE is also subject to the products exclusion. And Archer misapprehends the nature of the Completed Operations coverage, which would not have covered the damage to Sjonadal. The trial court properly denied Archer's CR 56(f) motion.

We affirm the order granting summary judgment and denying the motion to continue.

COLEMAN and ELLINGTON, JJ., concur.