IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

|  |  |  |
|---|---|---|
| BANK OF INDIA, SAN FRANCISCO AGENCY, | ) ) ) | No. 80880-0-I |
| Respondent, | ) ) ) | DIVISION ONE |
| v. | ) ) | UNPUBLISHED OPINION |
| SHRENUJ USA, LLC, a Delaware limited liability company; SJ CONSIGNMENT VENTURE, LLC, a Delaware limited liability company, | ) ) ) ) ) ) | |
| Appellant. | ) ) | |

ANDRUS, A.C.J. — SJ Consignment Venture LLC (SJC) purchased $5 million of jewelry from Shrenuj USA LLC (Shrenuj) shortly before Shrenuj went out of business. Bank of India, San Francisco Agency (Bank), Shrenuj's secured creditor, successfully obtained a judgment against SJC for conversion of this inventory after establishing on summary judgment that SJC was not a buyer in the ordinary course. SJC challenges the summary judgment, arguing the trial court erred in concluding it was not a buyer in the ordinary course and the Bank did not waive its security interest in the collateral, denying SJC's CR 56(f) continuance, certifying the judgment against SJC as final under CR 54(b), and miscalculating the judgment amount. We affirm.

Citations and pin cites are based on the Westlaw online version of the cited material.

FACTS

Shrenuj supplied diamond rings, loose diamonds, gemstones, and other supplies to jewelers and jewelry retailers. Established in 2005, Shrenuj was a subsidiary of a leading India diamond conglomerate, the Shrenuj Group. Shrenuj shared office space in Tukwila, Washington, with another Shrenuj Group subsidiary, Simon Golub & Sons, Inc.

When Shrenuj sought to establish business relationships with major retailers in the United States, the Bank extended Shrenuj a $4 million operating line of credit. Shrenuj's major retail customer, Signet Jewelers[1] (Signet), regularly purchased jewelry from Shrenuj on consignment. Under the consignment structure, Shrenuj sent Signet specifically identified jewelry which had a "databased contract purchase price." Signet marked up the jewelry, sold it to its retail customers, retained the mark-up, and paid the contract purchase price to Shrenuj.

The Bank and Shrenuj entered into a revolving credit agreement, a revolving credit note, and a security agreement. Under the security agreement, Shrenuj granted to the Bank "a continuing security interest in all of the personal property of Borrower and any and all proceeds and products thereof . . . including without limitation: . . . (b) Inventory . . . ." The Bank filed a UCC financing statement to perfect its security interest in this collateral. The financing statement, like the security agreement, identified the collateral as "[a]ll assets of [Shrenuj], whether now owned or hereafter acquired and wherever located."

---

[1] Signet Jewelers is a group of jewelry retailers which includes Sterling Jewelers Inc., Sterling Inc., Sterling Jewelers LLC, Zale Delaware Inc., TXDC L.P., and Zale Canada Co.

Shrenuj maintained a substantial balance on its line of credit, which peaked in November 2014 at almost $3.5 million. The Bank and Shrenuj amended their loan agreements in 2015, at which time Shrenuj agreed to make monthly payments of all accrued interest and an additional monthly payment of $35,000 to reduce the account balance. Shrenuj complied with these terms until February 2016, by which time it reduced its balance to just over $2.9 million. But in March 2016, Shrenuj defaulted on its obligations by failing to make its monthly payment. It made a delinquent interest payment on April 21, 2016, but made no further payments to the Bank.

On April 18, 2016, Shrenuj and SJC sent Signet a "Joint Letter of Direction to Consignment Customers." This letter notified Signet that as of April 1, 2016, Shrenuj had sold and assigned to SJC all merchandise Shrenuj had sent to Signet and all rights to payment with respect to that consigned merchandise. Shrenuj and SJC directed Signet to send any payments for sales of consigned merchandise on or after April 1 directly to SJC.

SJC paid Shrenuj a total of $5,087,036 for the inventory held by Signet through four payments of amounts ranging from $489,000 to $800,000 between May 4 and June 3, 2016. Shrenuj did not use any of the proceeds to pay off its debt to the Bank.

On October 21, 2016, the Bank called Shrenuj's loan and demanded payment of $2,953,361, the outstanding balance on the credit note. When Shrenuj failed to pay, the Bank filed a complaint in superior court for the appointment of a receiver. On November 23, 2016, the superior court appointed the Stapleton

Group Inc. as the general receiver (Receiver), authorizing it to take control of the Shrenuj property, including its inventory and accounts receivable, wherever located. By the time the court appointed the Receiver, Shrenuj was no longer in business and had no employees performing any tasks for the company.

The same Receiver was acting as a court-appointed receiver for Shrenuj's sister company, Simon Golub & Sons, and through that appointment had become familiar with Shrenuj's operations. The Receiver took control of Shrenuj's bank account and obtained a backup of the accounting system with which the Receiver performed a forensic accounting. The Receiver discovered Shrenuj had a large receivable from Signet and notified that company of the receivership. Signet, which held a significant amount of Shrenuj's jewelry inventory on consignment, informed the Receiver of the Letter of Direction it had received from Shrenuj and SJC. At the Receiver's request, Signet ceased making payments to SJC and retained the funds it owed to Shrenuj.

The Receiver, the Bank, and Signet negotiated an agreement under which Signet would pay the Receiver all monies it held on account of the sale of Shrenuj inventory and would pay the Receiver any money owed as the result of ongoing sales of the remaining jewelry. When the Receiver sought court approval for this agreement, SJC objected, contending it owned the inventory free and clear of the Bank's security interest.

The parties thereafter agreed Signet would pay the Receiver any funds owed to Shrenuj for the sale of jewelry before April 1, 2016, and Signet would hold all funds from post-April 1 sales pending a judicial determination of the Bank's and

- 4 -

SJC's competing interest in the money and jewelry. The court approved this agreement on February 5, 2018. By the time the court entered this order, Signet had already sent SCJ sales proceeds of $1,095,486 and returned inventory worth $2,757,641. Signet held another $235,340 from additional sales and retained inventory with a book value of $929,623.

In March 2018, the Bank amended its complaint against Shrenuj to allege a claim of conversion against SJC, alleging the inventory Shrenuj sold to SJC was subject to the Bank's security interest. It sought to foreclose on the cash and inventory held by Signet and sought judgment against SJC for conversion of the sale proceeds and inventory SJC had received from Signet.

Over 15 months later, the Bank moved for summary judgment, asking the court to declare that the Bank held a first position security interest in all of Shrenuj's inventory consigned to Signet and the proceeds from the sale of that inventory, to authorize Signet to release sales proceeds and the remaining inventory to the Bank, and to hold SCJ liable for conversion for the amount Shrenuj still owed the Bank. By that point, the Bank had recovered, through the Receiver's collection efforts, $982,497.05, and Shrenuj's outstanding balance was $2,636,638.12.

The Bank argued SJC acquired Shrenuj's inventory subject to its perfected security interest because SJC was not a "buyer in the ordinary course of business" under RCW 62A.1-201(9). It maintained SJC acquired the goods in a "transfer in bulk," a type of transaction explicitly excluded from the statutory definition of "buyer in ordinary course of business." The trial court agreed. It found no dispute that SJC had purchased the entire inventory consigned to Signet, which was

substantially all of Shrenuj's merchandise. The court also determined, based on undisputed evidence, that:

> Shrenuj ceased doing business after the sale to SJ Consignment, and it defaulted on its line of credit payments, which Shrenuj had never done before the sale to SJ Consignment. While there is evidence in the record that Shrenuj had made large sales of jewelry in the past to others, there was no evidence before this court that suggests that Shrenuj had ever before sold approximately $5 million in inventory in what was essentially a single transaction before the sale to SJ Consignment. Nor was there evidence that any of Shrenuj's prior sales were for Shrenuj's entire "stock of good[s], wares or merchandise" as was the sale to SJ Consignment.

The trial court concluded there were no material facts in dispute that would allow a reasonable trier of fact to conclude the sale of Shrenuj's inventory "was anything other than a bulk sale," which prevented SJC from being considered a buyer in the ordinary course of business.

The trial court also held SJC liable for conversion of the Bank's secured collateral and the proceeds generated from the sale of that collateral. It entered judgment against SJC in the amount of $1,627,833.50, giving SJC credit for Signet's interim payments, proceeds Signet held, and the value of the inventory still in Signet's possession. The trial court rejected SJC's request for a credit of approximately $40,000 that the Receiver held and that SJC alleged would be paid to the Bank.

## ANALYSIS

SJC raises three main issues on appeal. First, it argues there are genuine issues of fact as to whether SJC was a buyer in the ordinary course entitled to take Shrenuj's inventory free and clear of the Bank's security interest. Second, it contends the trial court erred in denying its request for a CR 56(f) continuance

because it had not completed discovery and the Bank had withheld pertinent records. Finally, it maintains the trial court erred in entering a final judgment against SJC under CR 54(b) before the Bank had resolved its claim against Shrenuj and erred in calculating the amount of the judgment against SJC.

A.     Buyer in Ordinary Course of Business

SJC first argues it was a buyer in the ordinary course and its purchase of Shrenuj's inventory did not constitute a "transfer in bulk." SJC further contends the Bank waived its security interest by impliedly consenting to this transaction. The undisputed evidence, however, supports neither proposition.

Under RCW 62A.9A-320(a), a "buyer in ordinary course of business . . . takes free of a security interest created by the buyer's seller, even if the security interest is perfected and the buyer knows of its existence." A "buyer in ordinary course of business" is

> a person that buys goods in good faith, without knowledge that the sale violates the rights of another person in the goods, and in the ordinary course from a person . . . in the business of selling goods of that kind. A person buys goods in the ordinary course if the sale to the person comports with the usual or customary practices in the kind of business in which the seller is engaged or with the seller's own usual or customary practices. . . . "Buyer in ordinary course of business" does not include a person that acquires goods in a transfer in bulk or as security for or in total or partial satisfaction of a money debt.

RCW 62A.1-201(b)(9) (emphasis added).

The undisputed evidence establishes that Shrenuj's transaction with SJC was not in the ordinary course of the wholesale jeweler's business. Chad Wilson, the Receiver's representative, testified that Shrenuj's "primary business was the sale of piecemeal jewelry to US retailers." He explained that Shrenuj's business

dealings involved domestic retailers ordering jewelry from Shrenuj and Shrenuj selling pieces to those retailers on consignment at wholesale prices.

SJC is not a retailer of jewelry, like Signet. In fact, SJC did not exist prior to its transaction with Shrenuj.[2] According to Parag Vora, SJC's managing member, he and his business associate, Abhay Javeri, learned of the opportunity to purchase Shrenuj's inventory, already on consignment to Signet, and believed buying that inventory "presented an opportunity to build a new consignment-sales business in the fashion-jewelry segment" and to "further develop the relationship with Sterling Jewelers and Zale Corporation." Vora had an existing but nonoperational company that he renamed for the sole purpose of paying Shrenuj for its consignment inventory. SJC, by its own admission, was looking to take over Shrenuj's entire business and to essentially step into its shoes. Such a transaction is by definition outside of the ordinary course of Shrenuj's business. The sale to SJC was akin to a liquidation sale or going-out-of-business sale, and not a transaction with a large retail client with whom Shrenuj intended to continue to do business.

Furthermore, the record does not support SJC's contention that Shrenuj ordinarily made similar large jewelry sales to another competing wholesale jewelry seller. After reviewing Shrenuj's accounting system, Wilson testified that he identified only one other domestic sale, to the retailer Zales, that was in excess of one million dollars. Wilson explained that while Shrenuj did have annual

---

[2] At the time the sale between Shrenuj and SJC occurred on April 1, SJC did not yet exist as a company operating under that name. On April 6, 2016, Lois Hill Holdings LLC changed its name to SJ Consignment Venture LLC.

consignment sales of jewelry to Zales in 2015 totaling more than $7.7 million, these sales consisted of 889 individual invoices, rather than a "single bulk sale of almost all of Shrenuj's existing inventory."

Unlike Zales, SJC did not take Shrenuj's jewelry on consignment and did not intend to sell that jewelry in a retail setting. Instead, SJC purchased almost all of Shrenuj's inventory over a period of 30 days, after which Shrenuj went out of business. No reasonable trier of fact could conclude that the transactions with Signet or Zales were the same as or similar to the transaction with SJC.

SJC argues that Wilson's testimony should be disregarded because his opinions lack adequate foundation to be admissible and contain improper legal conclusions of what constitutes a "bulk sale" under the law.[3] We disagree. First, Wilson's opinions about Shrenuj's business practices and transactions were based on his personal knowledge obtained from reviewing extensive documents relating to Shrenuj's accounting system and business. Wilson explained that, at the time the trial court appointed the Receiver, he was familiar with Shrenuj's operations because his company was the general receiver for Simon Golub & Sons, which shared operations with Shrenuj. Wilson testified that the Receiver took control of Shrenuj's "bank account and obtained a back-up of the accounting system in order to perform a forensic accounting." Wilson "reviewed purchase and sale reports

---

[3] SJC argues the trial court erred in considering inadmissible evidence when ruling on the Bank's summary judgment motion. But our review of the trial court's summary judgment decision, including its evidentiary rulings, is de novo. Lybbert v. Grant County, 141 Wn.2d 29, 34, 1 P.3d 1124 (2000); American. Express Centurion Bank v. Stratman, 172 Wn. App. 667, 674-75, 292 P.3d 128 (2012). The fact that inadmissible evidence was presented to the trial court does not require reversal of summary judgment. Cano-Garcia v. King County, 168 Wn. App. 223, 249, 277 P.3d 34 (2012) ("We presume the trial court disregarded any inadmissible evidence."). We will disregard inadmissible evidence in assessing SJC's arguments on appeal. A significant amount of the challenged evidence is simply not relevant to the bulk sale analysis.

directly from the Shrenuj USA accounting system for the years 2012 through 2016." From his knowledge of Shrenuj's accounting, Wilson opined that Shrenuj's "primary business was the sale of piecemeal jewelry to US retailers." Wilson's testimony is supported by an adequate foundation and personal knowledge.

Second, Wilson's opinion that Shrenuj was not in the business of making bulk transfers of jewelry is not an impermissible legal conclusion. Under ER 704, a witness may testify in the form of an opinion or inferences even if it embraces an ultimate issue to be decided by the trier of fact, but that witness may not testify as to what law applies to a case, what the law means, or what the law obligated a party to do. Hyatt v. Sellen Constr. Co., Inc., 40 Wn. App. 893, 899, 700 P.2d 1164 (1985). Here, Wilson did not testify as to what the law is or how that law should be applied to this case. Instead, Wilson offered an opinion of fact—that Shrenuj did not ordinarily sell jewelry in bulk transactions like the transaction with SJC. Wilson's testimony is thus not inadmissible.

Next, SJC argues there are questions of fact whether the Bank waived its security interest in the inventory by consenting to Shrenuj's bulk sale to SJC. Under RCW 62A.9A-315(a)(1), the Bank's security interest continues in the secured collateral "notwithstanding sale, . . . or other disposition thereof unless the secured party authorized the disposition free of the security interest." A secured party may waive its right to the security interest in the collateral in the hands of third parties. Cent. Wash. Bank v. Mendelson-Zeller, Inc., 113 Wn.2d 346, 352, 779 P.2d 697 (1989). A waiver is the intentional relinquishment of a known right. Id. at 353 (quoting Wagner v. Wagner, 95 Wn.2d 94, 102, 621 P.2d 1279 (1980)).

- 10 -

To constitute an implied waiver, there must be "unequivocal acts or conduct evidencing an intent to waive; waiver will not be inferred from doubtful or ambiguous factors." Id. at 354 (quoting Wagner, 95 Wn. 2d at 102). SJC presented no evidence of any such unequivocal act.

SJC contends the Bank authorized Shrenuj to sell its inventory in the security agreement. Section 6 of the security agreement provides that Shrenuj shall not

> (a)    Sell . . . the Collateral, except that prior to the exercise of rights by [the Bank] during the continuance of an Event of Default hereunder, [Shrenuj] may sell Collateral consisting of furniture, furnishings, inventory and obsolete equipment in the ordinary course of its business and in accordance with its past practices….

(Emphasis added.) But SJC's reliance on this provision of the security agreement is simply a reprise of its "buyer in the ordinary course of business" argument. The Bank did agree that Shrenuj could make sales of inventory in the ordinary course of its business. It did not agree that Shrenuj could sell substantially all of its inventory to a company that wanted to take over its entire business. This transaction was neither a sale in the ordinary course of Shrenuj's business nor a sale in accordance with its past practices. SJC presented no evidence to the contrary.

SJC also maintains the Bank, through its course of performance in extending credit to Shrenuj, "approved and expected sales of large lots of inventory." But there is no evidence that the Bank, by extending credit to Shrenuj, agreed Shrenuj could conduct a liquidation sale to a company that planned to take over its pre-existing customer relationships and effectively step into Shrenuj's

shoes. Evidence that the Bank expected Shrenuj to make large sales to Signet, on an ongoing basis, in order to generate profits with which to pay down its debt to the Bank does not support the inference that the Bank expected Shrenuj to sell off its entire inventory to SJC so that SJC could take over Shrenuj's place as a wholesaler of fine jewelry.

Summary judgment was appropriate because the undisputed evidence demonstrates the sale of inventory from Shrenuj to SJC was not in the ordinary course of Shrenuj's business and the Bank did not waive its security interest in that inventory.

B. SJC's CR 56(f) motion

SJC next contends summary judgment should be reversed because the Bank wrongly withheld documents in discovery. We conclude the court did not abuse its discretion in rejecting this argument.

CR 56(f) provides:

Should it appear from the affidavits of a party opposing the motion that for reasons stated, [they] cannot present by affidavit facts essential to justify [their] opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

A court may deny a CR 56(f) motion if "(1) the moving party does not offer a good reason for the delay in obtaining the evidence; (2) the moving party does not state what evidence would be established through the additional discovery; or (3) the evidence sought will not raise a genuine issue of fact." West v. Seattle Port Comm'n, 194 Wn. App. 821, 833-34, 380 P.3d 82 (2016).

We review a trial court's CR 56(f) ruling for abuse of discretion. <u>Mut. of Enumclaw Ins. Co. v. Patrick Archer Constr., Inc.</u>, 123 Wn. App. 728, 743, 97 P.3d 751 (2004). A trial court abuses its discretion if it bases its decision on untenable grounds or for untenable reasons. <u>West</u>, 194 Wn. App. at 834.

The trial court did not explicitly rule on SJC's CR 56(f) motion. But in the absence of a reason for a discretionary ruling, this court may affirm if it is apparent from the record that there was a tenable reason for denying the motion. <u>See Snohomish Reg'l Drug Task Force v. 414 Newberg Rd.</u>, 151 Wn. App. 743, 761, 214 P.3d 928 (2009) (where it is obvious from the record why amendment would have been futile, the trial court does not abuse its discretion by failing to explain its denial of leave to amend); <u>Rodriguez v. Loudeye Corp.</u>, 144 Wn. App. 709, 730, 189 P.3d 168 (2008) ("Thus, the case law permits us to affirm without an explicit explanation for the denial in some circumstances.").

The record reveals a tenable reason for denying SJC's CR 56(f) motion— SJC failed to demonstrate that the Bank withheld documents that would have raised a genuine issue of material fact.

SJC contends the Bank wrongfully withheld internal bank emails and other transaction records that would show a course of performance between the Bank and Shrenuj which might demonstrate the Bank knew of and agreed to large inventory sales to Shrenuj customers. The record does not support this argument.

SJC appeared in this case in January 2018, yet it waited some 15 months, when the Bank noted a motion for summary judgment, to issue discovery to the Bank and the Receiver. The Bank responded to the discovery requests within 30

days and produced almost 15,000 pages of documents, including bank transaction records, Shrenuj financial documents, communications between the Bank and Shrenuj, and internal memoranda and loan approval documents.

During a CR 30(b)(6) deposition of Manas Jha, the Bank's Vice President, SJC asked if the Bank had produced "all documents" relating to Shrenuj. Jha testified he had produced "most of the communications" between the Bank and Shrenuj, but he had not produced individual "transaction vouchers" because each transaction reflected in these vouchers was identified in a bank ledger that he had produced. He explained to the court that the Bank uses the withheld vouchers for internal purposes to track all transactions but they are merely "back-up slips" documenting information otherwise reflected on bank statements and are unrelated to Shrenuj's assets or liabilities. Jha also explained that he had not produced internal emails between the Bank's San Francisco agency and its parent offices in New York and India. He provided the court with a sample copy of the withheld emails, the contents of which he described as being duplicative of what was included in official credit memos in the bank file that he had produced.

Although the back-up documents and emails appear responsive to SJC's discovery requests, and should have been produced regardless of their duplicative nature or Jha's own evaluation of their relevance, SJC has failed to demonstrate that these internal documents would have raised an issue of material fact. The Receiver produced all records relating to Shrenuj's ordinary business practices and its transaction history. The Bank produced all of the documents describing its course of performance with Shrenuj. SJC cannot explain how internal vouchers or

duplicative emails could have manifested a waiver of its rights in Shrenuj's collateral. Had the Bank actually waived such rights, the waiver would necessarily have had to be communicated to Shrenuj. Based on our reading of Jha's deposition and declaration, the Bank produced all communications with Shrenuj. Aside from making bald assertions that the withheld documents will raise an issue of material fact, SJC has not explained what specific information the transaction vouchers or emails between the Bank and its parent company will demonstrate.

SJC relies on Tellevik v. 31641 W. Rutherford St., 120 Wn.2d 68, 90, 838 P.2d 111 (1992) to support its position that the trial court abused its discretion in denying the continuance. But Tellevik is factually distinguishable. In that case, the State sought the forfeiture of real property allegedly involved in an illegal marijuana grow operation. Id. at 72. An owner, Janet Pearson claimed she was an innocent owner with no knowledge of the illegal activity conducted on her property. Id. at 75, 87. The State moved to continue Pearson's summary judgment, requesting time to gather evidence of Pearson's knowledge and consent to the drug operation. Id. at 89. The trial court rejected the continuance motion.

The Supreme Court reversed for three reasons. First, the State identified the specific evidence it sought: evidence that Pearson lived in the house, shared in the control of the family finances, and was involved in drying and packaging the marijuana. Id. at 89-90. Second, the State had attempted to obtain some of this same evidence from Pearson directly through both informal and formal discovery but counsel had not responded to any production requests. 120 Wn.2d at 90. Finally, shortly before the State received Pearson's motion for summary judgment,

it learned the identity of the confidential informant who could corroborate the information sought in discovery, but was unable to locate that informant until more than a month after the motion was filed. Id. at 90-91. The Supreme Court concluded that, under these circumstances, the trial court should have continued the hearing to allow the State to complete discovery because the evidence sought would have raised a genuine issue of fact as to Pearson's knowledge of and acquiescence in the illegal activity and the "necessary information was not obtained because defendants' counsel did not provide the requested documents when asked informally nor when served with requests for production." Id.

Here, SJC waited over a year to begin discovery. And once the Bank received formal discovery requests, it promptly produced a significant amount of documentation in a short amount of time. It did not refuse to respond to SJC's discovery requests. Furthermore, the internal documents SJC sought are distinct from what the State sought in Tellevik. The State had a good-faith basis to believe that the informant's testimony would directly contradict Pearson's evidence and establish she had direct knowledge of drug activities on her property. In contrast, SJC's argument that the internal bank documents could establish implied consent to the transaction is speculative at best.

The trial court did not abuse its discretion in denying the CR 56(f) motion because it is apparent from the record that there was a tenable reason for doing so—SJC did not demonstrate that additional discovery would have raised a genuine issue of material fact.

C. Trial Court's Entry of Final Judgment

SJC argues that the trial court erred in entering final judgment against SJC under CR 54(b) before the Bank obtained a judgment against Shrenuj and the court miscalculated the judgment amount because it did not offset funds the Receiver possessed and might release to the Bank. We reject both arguments.

Pursuant to CR 54(b), when a case involves multiple parties, the trial court may enter final judgment against fewer than all of the parties "only upon an express determination in the judgment, supported by written findings, that there is no just reason for delay and upon an express direction for the entry of judgment." We review a trial court's decision to enter judgment under CR 54(b) for abuse of discretion. Hurlbert v. Port of Everett, 159 Wn. App. 389, 404, 245 P.3d 779 (2011). The trial court should consider several factors when determining whether there is no just reason for delaying the entry of judgment

> (1) [T]he relationship between the adjudicated and the unadjudicated claims, (2) whether questions which would be reviewed on appeal are still before the trial court for determination in the unadjudicated portion of the case, (3) whether it is likely that the need for review may be mooted by future developments in the trial court, (4) whether an immediate appeal will delay the trial of the unadjudicated matters without gaining any offsetting advantage in terms of the simplification and facilitation of that trial, and (5) the practical effects of allowing an immediate appeal.

Id. at 406 (quoting Lindsay Credit Corp. v. Skarperud, 33 Wn. App. 766, 772, 657 P.2d 804 (1983)).

The trial court entered written findings of fact supporting its CR 54(b) entry of judgment. It found the Bank's claims against Shrenuj and SJC are "separate and distinct." It further found Shrenuj had never appeared in defense of the case,

- 17 -

had been placed into receivership by the court, and was a defunct entity with no viable assets to pay the Bank.  Finally, it found it was unlikely that the judgment against SJC would be mooted by any future developments at the trial court level.  It concluded that these circumstances warranted entry of final judgment against SJC under CR 54(b).  SJC did not assign error to any of the trial court's findings of fact and the findings support entry of judgment under CR 54(b).  We see no abuse of discretion in entering a final judgment against SJC under these circumstances.

SJC next contends the trial court erred in computing the Bank's conversion damages.  In cases where a perfected security interest survives the disposition of the collateral, such as here, the secured party may maintain an action against the purchaser for conversion.  Western Farm Service, Inc. v. Olsen, 151 Wn.2d 645, 648, n. 1, 90 P.3d 1053 (2004).  The measure of damages in conversion is the value of the article converted at the time of the taking.  Washington State Bank v. Medalia Healthcare LLC, 96 Wn. App. 547, 554, 984 P.2d 1041 (1999).

The trial court entered judgment against SJC in the amount of $1,627,833.50.  The court calculated this amount by taking the outstanding principle owed by Shrenuj as of June 10, 2016, then subtracting the interim payments Signet made through March 7, 2018, and adding interest accrued through November 1, 2019.  From this subtotal, the court deducted the amount of proceeds and inventory left on hand with Signet.  The evidence supporting these calculations was undisputed.

SJC does not challenge the method by which the court determined the judgment amount.  Instead, it argues the court erred in failing to reduce the

judgment amount by the amount of funds the Receiver still held at the time the court entered judgment. According to the September 2019 Receiver report, it had an estimated $40,875 in cash on hand after liquidating Shrenuj's assets and paying the Receiver's fees and the fees of the Receiver's counsel. But that report also indicated the Receiver still had work to do—it had to collect the proceeds and inventory in Signet's possession. The Receiver indicated it would continue to retain counsel to assist with this process. Thus, at the time the court entered judgment against SJC, it was unclear whether any cash then in the possession of the Receiver would be available to the Bank or to any other creditor.

The trial court did not abuse its discretion in entering final judgment against SJC under CR 54(b) and SJC fails to demonstrate the court improperly calculated the judgment amount.

We affirm.

_Andrus, A.C.J._

WE CONCUR:

_Chun, J._                    _Mann, C.J._